Nathaniel ROBERTS, et al., Plaintiffs,

v.

MAHONING COUNTY, et al., Defendants,

v.

City of Youngstown Intervenor.

No. 4:03 CV 2329.

United States District Court, N.D. Ohio, Eastern Division.

May 17, 2007.

Paul J. Gains (# 0020323), Prosecuting Attorney, Linette M. Stratford (# 0047223), Assistant Prosecuting Attorney, Mahoning County Prosecutors Office, Youngstown, OH.

Iris Torres Guglucello (# 0019416), Law Director, Anthony J. Farris (# 0055695), Deputy Law Director, City of Youngstown, Youngstown, OH.

Robert Armbruster (# 0011623), Armbruster, Kelley, Kot, Honeck & Baker, Akron, OH.

Thomas Kelley (# 0016820), Armbruster, Kelley, Kot, Honeck & Baker, Akron, OH.

Before BATCHELDER, Circuit Judge, DOWD and POLSTER, District Judges.

## CONSENT JUDGMENT ENTRY WITH A STIPULATED POPULATION ORDER

PER CURIAM.

1. This action was commenced on November 14, 2003 by Nathaniel Roberts, James Joseph Mancini, Joshua Baird, Kevin Whitacker, Mike Hamad, Rodney Gray, Leland Scott and Maurice Barnes as named Plaintiffs on behalf of all persons who are or who will be confined at the Mahoning County Justice Center.

2. Plaintiffs alleged in their complaint that conditions at the Justice Center violated the United States Constitution, the Ohio Constitution, Statutory Laws of the State of Ohio, and rules and regulations promulgated by the Ohio Department of Rehabilitation and Correction. Plaintiffs sought Declaratory and Injunctive Relief on behalf of the class. This action was brought against the County of Mahoning, acting through the Mahoning County Board of Commissioners and Randall A. Wellington, acting in his official capacity as the duly elected Mahoning County Sheriff. Upon imposition of this Three Judge Court the City of Youngstown intervened. Hereinafter Plaintiffs, Defendants, and Intervenor are collectively referred to as "Parties".

3. The Mahoning County Justice Center consists of two buildings, with close to 800 inmates being housed at the time of trial. The main facility is located at 110 Fifth Avenue, Youngstown, Ohio ("Justice Center"). The second building is called the Minimum Security Mahoning County Jail located at 360 W. Commerce Street, Youngstown, Ohio ("MSJ"). This building housed over 100 inmates and was closed in the spring of 2005. Its reopening is addressed later in this order. For purposes of this order the Justice Center and MSJ will be collectively referred to as "County Jail Facilities."

## CLASS CERTIFICATION

4. The Plaintiffs in their Complaint moved this Court to certify this as a Class Action pursuant to Civil Rule 23(a) and 23(b)(2). The Parties hereto stipulate and agree to the following:

A. This action was certified as a class action pursuant to Rule 23(a) and 23(b)(2) of the Fed. R. Civ.P on March 5, 2004.

B. That there are questions of law and fact common to the class. The Parties agree that: The named Plaintiffs claim and allege that Defendants have engaged in a common course of conduct toward them, and have instituted a pattern or practice of conduct, or effectuated policy and procedure all of which affect the entire class as a whole. The factual allegations made by the named Plaintiffs, by their very nature, are the type of allegations and claims which are common to other inmates at the Mahoning County Jail, past, present, and/or future. Common questions of law arise from these facts.

C. The claims of the representative Parties are typical of the claims of the class. The claims are typical since they arise from the same event or practice or course of conduct which gives rise to the claims of other class members. The claims of the named representatives are based on the same legal theories as those of the entire class. Due to the fact that there is a commonality and typicality between the claims of the named Plaintiffs and the class, declaratory and injunctive

relief is appropriate for the entire class.

D. The representative Parties have fairly and adequately protected the interest of the class. The interests of the named Plaintiffs are not and have never been antagonistic to those of the class. Counsel for the named Plaintiffs, Robert P. Armbruster and Thomas Kelley, have demonstrated their competence to vigorously prosecute the interest of the class and are experienced in the handling of cases of this type.

E. On March 5, 2004, the Court certified the following class:

All persons in the care or custody of the Mahoning County Sheriff and incarcerated on or after November 12, 2003 at the Mahoning County Justice Center, 110 Fifth Avenue, Youngstown, Ohio, ("Justice Center"), and also all persons in the care or custody of the Mahoning County Sheriff and incarcerated on or after November 12, 2003 at the Mahoning County Minimum Security Jail, 360 W. Commerce Street, Youngstown, Ohio ("MSJ").

F. The Plaintiff class has made no claims for damages.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over the Parties and subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1343(3). Venue is properly before this Court.

6. On December 13 through 15, 2004, the above captioned matter was tried to this Court. The named Plaintiffs, both pre-trial detainees and convicted prisoners being held in the custody of the Defendant Sheriff at the Justice Center, alleged the facilities were understaffed and overcrowded, creating unsafe and dangerous conditions for the inmates. Plaintiffs alleged that the lack of staff resulted in (1) the frequent lockdown of inmates for lengthy periods of time, (2) the inability to provide programs and services to the inmates, including but not limited to, recreation, visitation, religion, and inmate counseling programs, and (3) an inability to safely and securely house inmates. The inmates further alleged that the staff was not properly trained. Plaintiffs also alleged that the facilities were poorly maintained, creating unhealthy and dangerous conditions for the inmates. They also asserted that inmates were locked down in cells with toilets that accumulate human waste because they could not be flushed. They alleged that intercoms in cells did not work, prohibiting the inmates from contacting staff during periods of lockdown. Plaintiffs also claimed that the jail does not provide adequate legal resources or a legal access program, thus violating their constitutionally guaranteed right of access to the courts.

7. The Parties agree that the Plaintiffs have exhausted all administrative remedies prior to filing this lawsuit as a proposed class action.

## FINDINGS

8. As a result of the trial, the Court made extensive findings of fact and conclusions of law based on the testimony of inmates, experts, staff members and administrators who work at the jail. Said findings of fact and conclusions of law are contained in the Memorandum Opinion issued by this Court dated March 10, 2005. (Doc. No. 93), 2005 WL 5569487, 495 F.Supp.2d 670. That Memorandum Opinion is adopted as if it was fully rewritten here.

## PRISON LITIGATION REFORM ACT COMPLIANCE

9. The Court, in compliance with 18 U.S.C. § 3626(f)(2)(A), (B), and (C), appointed a Special Master (Doc. No. 108), 2005 WL 5569488, 495 F.Supp.2d 693.

Upon the recommendation of the Special Master, the District Court directed the Defendants to create a Criminal Justice Working Group to develop a remedial plan consistent with the United States Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The District Court's Order constituted an order for less intrusive relief in compliance with 18 U.S.C. § 3626(a)(1) of the PLRA (Doc. No. 193), 2006 WL 4606651, 495 F.Supp.2d 694. On May 1, 2006, the Criminal Justice Working Group issued its final report (Doc. No. 191) but was unable to arrive at a solution that would solve the unconstitutional conditions at the jail created by overcrowding.

10. The District Court has previously entered orders in this case that have failed to remedy the deprivation of Plaintiffs' constitutional rights. Defendants have had a reasonable amount of time to comply with the previous court orders. Thus, the prerequisites for convening a three-judge court as set forth in 18 U.S.C. 3626(a)(3)(A) have been satisfied.

11. In accordance with the District Court's May 25, 2006 Order (Doc. No. 193), this Three Judge Court was empaneled on June 8, 2006. (Doc. No. 194), 2006 WL 4606652, 495 F.Supp.2d 708.

12. On July 27, 2006, the City of Youngstown moved to intervene (Doc. No. 207) and was granted intervention (Doc. No. 209), 2006 WL 4606650, 495 F.Supp.2d 712. Subsequently this Court set the matter for trial on May 16, 2007 (Doc. No. 224), 2006 WL 4606656, 495 F.Supp.2d 713.

13. The Three Judge Court appointed Special Master Vince Nathan as the Court's expert for this phase of the litigation (Doc. No. 191). Mr. Nathan was charged with the task of collecting data and preparing an expert report of his findings and his opinion with respect to (1) whether crowding at the jail is the cause of constitutional violations, and, if so, (2) whether there is any other viable form of relief, short of a prisoner release order, that could remedy the violations. · Pursuant to this Court's Order, Mr. Nathan investigated the issues, and on December 3, 2006, filed a report containing his findings and his conclusions with this Court (Doc. No. 229). The findings and conclusions set forth by this Court's expert demonstrate that the jail is overcrowded resulting in violence to inmates and staff, that crowding is therefore the root cause of a constitutional violation and that there is no other viable remedy to cure the constitutional violation. (Doc. No. 229).

14. As a result of Mr. Nathan's report, Plaintiffs filed a Motion for Immediate Injunctive Relief on December 18, 2006 (Doc. No. 232). This Court set the matter for an emergency hearing to be held on December 28, 2006 at 9:30 a.m. (Doc. No. 234). The City of Youngstown filed a Response to Motion for Immediate Injunctive Relief (Doc. No. 237), and Mahoning County Defendants filed a Brief in Support of Plaintiffs' Motion for Immediate Injunctive Relief (Doc. No. 239).

15. At the hearing, Mr. Nathan authenticated his own expert report and this Court adopted his report and made it part of the record. Mr. Nathan answered preliminary questions from the panel and counsel for the Parties. In addition, all Parties agreed and stipulated that based on current staffing and population as highlighted in Mr. Nathan's Expert Report the conditions of the Jail are unconstitutional. After consideration of the briefs and arguments at the hearing, the panel confirmed that it would take the matter of Plaintiffs' Motion for Immediate Injunctive Relief under advisement (Doc. No. 245), 2006 WL 4606655, 495 F.Supp.2d 718. In the interim, the Court directed Judge Polster to engage in mediation. Judge · Polster met

with the Parties on January 3, 2007 at which time a tentative agreement was reached.

16. On February 28, 2007 the Three Judge Panel issued an Interim Stipulated Population Order (Doc. No. 251). Said order was issued with the purpose of immediately addressing overcrowding in the facility.

**PARTIES**

All Parties agree that:

17. The provisions of this Consent Order shall apply and be binding upon the Parties to this action, their agents, officers, employees, assigns, successors in interest and any persons acting in concert or privity with any of the Parties.

18. This Order shall in no way limit the Parties' claims or defenses in other actions, and shall not be interpreted as an admission to the validity of any other claims filed by members of the inmate class.

19. This Order shall govern as an order addressing those findings made in the memorandum opinion of this Court, the findings and conclusions raised in Mr. Nathan's Expert Report and those findings made in the Interim Stipulated Population Order. The Parties agree that this Order is narrowly drawn and intended to address only those factual findings and conclusions of law mentioned herein. The Parties agree and certify they are aware of no less intrusive way to address these findings and conclusions of law.

20. Now therefore, and upon consent of the Parties, based upon the need to address the above findings and conclusions of law, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

21. The Court has jurisdiction over the Parties and subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1343(3) and 18 U.S.C. § 3626. Venue is properly before this Court.

22. The District Court has previously entered orders in this case that have failed to remedy the deprivation of Plaintiffs' constitutional rights that are remedied with this Order. Defendants have had a reasonable amount of time to comply with the previous court orders. Thus, the prerequisites for convening a three-judge court as set forth in 18 U.S.C. 3626(a)(3)(A) have been satisfied.

23. This Court finds that this relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal rights found violated, and *is the least intrusive means necessary to correct those violations of Federal rights.* 18 U.S.C. § 3626(a)(1)(A). Moreover, this Court has considered and weighed any adverse impact on public safety and the effect on the operation of a criminal justice system in Mahoning County. 18 U.S.C. § 3626(a)(1)(A).

24. This Court finds by clear and convincing evidence that the terms of the Interim Stipulated Population Order strike a balance between the interest in public safety and the interest in maintaining a constitutional jail as it provides for the incarceration of all violent felons and for the reopening to maximum occupancy of all the jail facilities under the control of Mahoning County, while at the same time protecting the constitutional rights of inmates in the County Jail Facilities.

25. This Court finds by clear and convincing evidence based on the entire record that (1) crowding is the primary cause of the violation of a Federal right, and (2) no other relief will remedy the violation of the Federal right. 18 U.S.C. § 3626(a)(3)(E)(i) and (ii).

26. Thus, this Court finds that the factual predicate for imposition of a prisoner

release order, as set forth in 18 U.S.C. § 3626(a)(3)(E), has been established.

## AGREEMENT TO MEDIATE DIFFERENCES

27. It is anticipated that this Consent Order will be monitored by Plaintiffs' counsel, or by any monitor subsequently named by the Court, according to terms outlined later in this Order. The Parties hereby agree that any alleged violations of this agreement found by the Parties, before being brought to the attention of this Court, shall be mediated. Such mediation shall consist of a meeting of Plaintiffs' counsel and the appropriate Defendants and Intervenor. The complaining Party's counsel shall state in writing any alleged violation necessitating a meeting and give Defendants and Intervenor notice to investigate and then meet with counsel. If, after the meeting, the Parties indicate that they cannot resolve by way of agreement the problem discussed, any Party shall have the right to bring the alleged violation to the attention of this Court to either enforce the provisions of this Order or seek relief from the provisions of this Order.

## INMATE POPULATION/RELEASE ORDER

28. Now, therefore, upon stipulation of the Parties, based upon a need to address the population issue immediately, the Three Judge Panel orders that the Overcrowding Release Policy attached as Exhibit A in Doc. No. 251 be adopted to effectuate the following population limits and housing classifications designations.

## POPULATION

29. Decisions on capacity are based on standards which include square footage of cells and square footage of day-areas with sufficient programming for inmates. The Defendants agree to abide by these housing capacities.

30. All inmates classified as Maximum Security shall be single celled. All other medium and minimum security inmates may be double celled.

31. The Sheriff has adopted the practice of using boats (temporary beds) and placing mattresses on cell floors to create additional capacity. The Parties hereby agree that all boats shall be removed from general housing and inmates should only be housed on bunks affixed in cell units with the exception of medical housing.

32. The Parties agree to the following population/housing plan for the Justice Center. Said plan is based on the Sheriff properly classifying inmates as provided in paragraph 43 below and placing inmates in housing pods that are consistent with the classification. Nothing in this order shall forbid the Parties from meeting at a later time to agree to changes in the classification of housing units in the Mahoning County Jail.

**SIXTH FLOOR**

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|-----|-----|-----|-----|
| R | 36 | 52 | Medium Male |
| S | 36 | 52 | All Medium Male or All Minimum Male |
| T | 36 | 52 | All Medium Male or All Minimum Male |
| U | 36 | 52 | Medium Male |

Total beds available for use are subject to a 10% classification factor

**FOURTH FLOOR**

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|-----|-----|-----|-----|
| P | 36 | 36 | Max Male |
| Q | 36 | 36 | Max Male |
| L | 36 | 36 | Max Male |
| N | 18 | 18 | Minimum/Medium Intake Classification |

| O | 18 | 18 | Disciplinary Male |

Total beds available are subject to a 10% classification factor

Minimum/Medium-classification range maximum stay is five days

**SECOND FLOOR**

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|---|---|---|---|
| F | 18 | 18 | Max Female |
| G | 18 | 28 | Medium / Minimum Female |

Total beds available are subject to a 10% classification factor

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|---|---|---|---|
| H | 30 | 48 | Male Mental Health Special Needs |
| I | 6 | 6 | Male Segregation |

Total beds on H Pod are subject to a 10% classification factor

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|---|---|---|---|
| J | 6 | 6 | Male Juvenile Bind over as Adults |
| K | 30 | 30 | Male Maximum |

Total beds on K Pod are subject to a 10% classification factor

| POD | CELLS IN USE | TOTAL BEDS AVAILABLE FOR USE | CLASSIFICATION |
|---|---|---|---|
| D | 30 | 48/54 | Minimum Security Inmates/Male Inmate Workers |
| E | 6 | 6 | Male Administration Segregation |

Total beds on D Pod are subject to a 10% classification factor

Defendants may choose to use D Pod to house one of two groups of inmates—either inmate workers or minimum security inmates

## Minimum Security Facility (MSJ)

33. The Parties agree that a maximum of ninety-six (96) inmates can be housed in the MSJ. All are to be sentenced non-violent misdemeanant inmates, or non-violent sentenced 4th and 5th degree felons.

34. The Parties acknowledge that the National Institute of Corrections has undertaken a study of the County Jail Facilities. The National Institute of Corrections has recommended that the facility be run at 90% of capacity to allow for proper classification of inmates.

35. The Parties agree that within the Justice Center, all units classified as minimum security pods shall house no more than 90% of the total usable beds allotted to that classification. The Parties agree that all medium security ranges shall house no more than 90% of the total usable beds allotted to that classification. The Parties have agreed that all maximum security pods shall house no more than 90% of total usable beds allotted to that classification.

36. When arrests are undertaken in such a manner that the Sheriff is unable to plan for an influx of inmates to protect the public, the Sheriff may fill each pod up to the total available beds for use not to exceed a period of 24 hours on weekdays, 48 hours on weekends and 72 hours on holiday weekends. However, in no event shall the population in any pod exceed the total number of usable beds. The Sheriff shall have 24/48/72 hours to reduce the population back to said figure 10% below the total beds available for use which allows for the proper classification.

37. When numbers exceed those set forth, the Sheriff shall implement the Overcrowding Release Policy approved by all Parties and this Court which is attached hereto as Exhibit A and incorporated as if fully written herein. The Overcrowding Release Policy shall not apply to City Prisoners held pursuant to the Boarding of Prisoners Agreement entered into by Defendants and Intervenor and attached hereto as Exhibit B and incorporated as if fully written herein. The granting or revoking of bail shall not be construed to prevent release under this Order. The Sheriff shall have a right and authority to

release any and all prisoners regardless of any order from any other state or municipal court in order to maintain a population cap consistent with this Order except as provided in the Boarding of Prisoners Agreement attached as Exhibit B.

## STAFFING

38. This Court, on March 10, 2005, found that staffing levels at the County Jail Facilities were insufficient. The Court went into an extended analysis of studies done at the jail and its history of staffing levels.

39. The Parties agree that these studies will be used as a basis for staffing at the County Jail Facilities. These studies broke staffing down according to posts at each facility. The Parties hereby agree to use a direct supervision model requiring that all posts identified throughout the County Jail Facilities to be staffed on a 24/7-hour basis. When fully open, the Sheriff shall employ 168 line officers to posts which include floats (147 for Justice Center and 21 for MSJ).

40. It is also agreed when fully opened that the Defendants shall employ 18 supervisory staff.

41. It is finally agreed when fully opened the Defendants shall employ 23 jail clerical, support, administrative, and command staff.

42. It is the Parties' intent that upon the opening of any new pods, that the Parties reach an agreement that there are sufficient staff to open those pods and properly staff each identified post. It shall be the Defendants' responsibility to demonstrate that sufficient staff are employed and trained prior to filling all posts on a 24/7 basis prior to the opening of any additional housing areas. This includes posts for floats and supervisory staff as identified.

## CLASSIFICATION

43. The Sheriff has developed and adopted a population/classification plan that will allow the Sheriff to comply with capacity standards specified herein and classification guidelines recommended by the National Institute of Corrections. Said plan allows the facility to be operated in compliance with these standards. Said plan is attached here as Exhibit C. The Sheriff may find it necessary to change or amend said plan from time to time with the approval of Plaintiffs' counsel.

## TABLES

44. Defendants acknowledge that some pods do not have sufficient table space for all inmates to sit at meal time. Sufficient tables shall be added to day rooms to allow all inmates to sit at meal time.

## TRAINING

45. The Court made findings that staff training was deficient since 2001. It was found that the staff assigned to the Corrections Division had little or no training in policy direction to perform at levels compliant with minimum confinement standards. The Court also found since 2001, only one fire drill had been conducted and that did not involve the movement of inmates.

46. Defendants agree to fully train all staff in compliance with minimum standards for jails in Ohio.

47. The Parties agree that the Sheriff will implement training programs and put in place an active fire drill program that involves the movement of inmates. All activities involving fire safety and training shall be logged in writing and made available to monitor/Plaintiffs' counsel for verification purpose.

48. The Parties agree and understand that the Defendants are hiring up to at least 60 additional deputy sheriffs. These new deputy sheriffs shall be given com-

plete correction officer training prior to being stationed alone in the facility.

## LEGAL ACCESS

49. The Defendants at one time had a legal access program provided by the University of Akron's Law School Legal Clinic. The program was suspended due to lack of funds in September 2003. The program has been re-instituted and is presently operational. The Parties recognize that, because of the prior agreement to keep the population at 300 inmates, said legal access program is running at one-half of its intended capacity. Defendants agree to make said program fully operational prior to the re-opening of the final pod in the jail. The Parties agree that said program meets constitutional requirements for providing legal materials to inmates.

50. The Parties agree that notices about the legal access program shall be posted on each pod throughout the jail.

## DISCIPLINARY ISSUES

51. The Court in its findings of fact, found an unusually high number of inmate-on-inmate assaults, inmate-on-staff assaults and miscellaneous incidents of violence and use of force. The Court found that these statistics are a direct result of insufficient staffing and overcrowding. Parts of this Order are meant to address those concerns. The Parties agree that Sheriff shall keep incident reports documenting all inmate-on-inmate assaults, inmate-on-staff assaults and miscellaneous incidents of violence and use of force. Said reports shall be made available when requested to Plaintiffs' counsel. If unusually high numbers of assaults are found, the Parties agree to meet to mediate this problem.

## MAINTENANCE ISSUES

52. This Court has made numerous findings in regards to maintenance issues at the County Jail Facilities.

53. The Defendants agree that to keep the County–Jail–Facilities systems operational and limit breakdowns, a minimum number of maintenance people need to be employed in order to assure seven-day-a-week day turn, five-day-a-week afternoon turn, and weekend call out ability.

54. Staff radios have had a history of frequent problems due to old and worn out batteries. Defendants agree to keep an adequate supply of new batteries available to prevent staff radios from breaking down.

55. An intercom unit is located in each cell throughout the facility. The intercom provides communication with each guard station on each range to each cell. The intercom also provides communication from cells to the jail's central control. Intercoms have been a prevalent source of breakdowns. The Parties agree that said intercoms are a vital part of providing for the safety and security of inmates and deputy sheriffs throughout the facility. The Parties agree that Defendants shall keep all intercoms fully operational and maintain a written log monitoring inspection, breakdown and repair of the intercoms. This log shall be available to monitor/Plaintiffs' counsel for review.

56. Defendants agree to buy and maintain sufficient inmate mattresses, linen, clothing, and food trays.

57. The Court found numerous instances of CCTV cameras being broken, and computer screens which do not work. The Sheriff has implemented a program of inspection and agrees to upgrade and maintain the integrated security systems, including hardware and software within the next six (6) months. The Sheriff has maintained and will continue to maintain a maintenance log that records inspections, all reported camera/computer screen breakdowns throughout the facility, and repairs made thereto. Said maintenance

logs shall be available to Plaintiffs' counsel for inspection.

58. The Court made findings as to the general cleanliness of the facility and found it to be hazardous to the health of inmates, security staff, and civilian workers in the jail. The Sheriff has implemented a program to make daily inspections and Defendants will continue to insure that showers are clean, washing machines are operational, and all facility fixtures are operational and the sufficient cleaning supplies exist. The Sheriff has recorded and will continue to record inspections in a log.

59. The Defendants agree to properly maintain cell doors, locks, visitation phones, computer software systems, elevators, air handling systems, heating systems, and all other systems and components regulating life-safety, security, and safety of the County Jail Facilities and their occupants. Defendants shall regularly inspect each of these systems, making necessary repairs. All inspections and repairs shall be kept in a log.

60. The Defendants agree that the MSJ physical facility shall be assessed for all maintenance defects and addressed prior to re-opening. Upgrades and maintenance prior to opening shall be discussed and explained to Plaintiffs' counsel.

61. Defendants agree to provide a security upgrade for the inmate/public visitation areas.

## LOCKDOWNS

62. This Court made findings that as a result of lack of staff, the inmates at the Justice Center were frequently locked down for lengthy periods of time. The Sheriff agrees that lockdown logs shall be kept indicating any unscheduled lockdowns that occur in the facility, length of the lockdown and the reason for said lockdowns. These logs shall be maintained and made available to Plaintiffs' counsel for inspection.

## RECREATION

63. Due to safety and security issues with fencing in outdoor recreation areas, the Defendants suspended all outdoor recreation at the Justice Center. The Defendants have undertaken a study to insure that these outdoor recreation areas could be operating in the future in a safe and secure manner. In order to accomplish this goal, certain structural changes must be made to the fencing in the outdoor recreation areas. Defendants agree to make said changes for the outdoor recreational areas so that they will be operational by August 1, 2007. The Sheriff agrees to properly supervise outdoor and indoor recreation.

## MONITORING

64. During the pendency of this Order, Plaintiffs' counsel shall monitor and review Defendants' compliance with the terms of this Order. Said monitors shall visit at least monthly and no more than twice a month to review compliance.

65. The Sheriff agrees to continue to make available to Plaintiffs' counsel by way of email daily population figures indicating the total number of inmates in the facility. Defendants shall also furnish a breakdown of inmates housed by pod.

## ATTORNEYS FEES

66. The Plaintiffs and Defendants have reached an agreement in regards to the payment of attorneys fees associated with the trial of this matter. Said fees were agreed paid through May 28, 2006. Since that time, Plaintiffs counsel has on a quarterly basis filed hours reflecting attorneys fees. Defendants shall have the right to review and question the accuracy of said hours but nonetheless agree to pay Plaintiffs counsel said fees within thirty (30) days of the signing of this Order at a rate of $186.00 per hour.

67. The Plaintiffs and Defendants anticipate that additional attorneys' fees will be associated with monitoring and enforcement of this Order. Said costs of monitor/Plaintiffs counsel and/or Plaintiffs' counsel shall be paid on a yearly basis. Defendants shall pay costs for reasonable monitoring fees/reasonable attorneys' fees and expenses approved by this Court on an annual basis. Monitoring rates are to be billed at an office rate not to exceed $150.00 an hour. The rates for actual legal work including in court or out of court brief writing are to be billed at a rate of $186.00.

## CONTINUING JURISDICTION

68. The Parties understand and agree that the County Jail Facilities shall be fully operational and at maximum capacity as defined in this Order by August 1, 2007.

69. This Court specifically retains jurisdiction over this action for three years to ensure compliance and to issue additional Orders as required by Justice or as the Parties may request. All additional changes shall be in writing.

**IT IS SO ORDERED.**

/s/ Alice M. Batchelder
JUDGE ALICE M. BATCHELDER

/s/ David D. Dowd, Jr.
JUDGE DAVID D. DOWD, JR.

/s/ Dan Aaron Polster
JUDGE DAN AARON POLSTER

Mahoning County Officials:

/s/ Randall A. Wellington
RANDALL A. WELLINGTON, SHERIFF

/s/ Anthony T. Traficanti
ANTHONY T. TRAFICANTI, COMMISSIONER

/s/ David Ludt
DAVID LUDT, COMMISSIONER

/s/ John A. McNally, IV
JOHN A MCNALLY, IV, COMMISSIONER

City of Youngstown
Board of Control:

/s/ Jay Williams
JAY WILLIAMS, MAYOR

/s/ ABSENT
DAVID BOZANICH,
FINANCE DIRECTOR

/s/ Iris Torres Guglucello
IRIS TORRES GUGLUCELLO,
LAW DIRECTOR

APPROVED BY:

/s/ Paul L. Gains
PAUL J. GAINS (#0020323)
Prosecuting Attorney
LINETTE M. STRATFORD (#0047223)
Assistant Prosecuting Attorney
Mahoning County Prosecutors Office
21 W. Boardman Street 6th Floor
Youngstown, OH, 44503

/s/ Robert Armbruster
ROBERT ARMBRUSTER (#0011623)
Armbruster, Kelley, Kot, Honeck & Baker
159 S. Main St., Suite 720
Akron, OH 44308

/s/ Anthony J. Farris
IRIS TORRES GUGLUCELLO (#0019416)
Law Director
ANTHONY J. FARRIS (#0055695)
Deputy Law Director
City of Youngstown
26 South Phelps Street
Youngstown, OH 44503

/s/ Thomas Kelley
THOMAS KELLEY (#0016820)
Armbruster, Kelley, Kot, Honeck & Baker
159 S. Main St., Suite 720
Akron, OH 44308

EXHIBIT A

IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

IN RE:

MAHONING COUNTY JAIL
OVERCROWDING RE-
LEASE POLICY

CASE NO. 06 CV Open

May 1, 2006

JUDGMENT ENTRY

This matter is before the Court for approval of the Overcrowding Release Policy (attached hereto) to resolve the lack of staffing due to inadequate funding at the Mahoning County Jail. Upon recommendation of the Criminal Justice Working Group and upon due consideration thereof, the Overcrowding Release Policy is unanimously adopted by the Judges of this Court effective immediately.

IT IS SO ORDERED.

_____

HON. ROBERT A. DOUGLAS, JR.
JUDGE
MUNICIPAL COURT

/s/ R. Scott Krichbaum
HON. R. SCOTT KRICHBAUM, JUDGE
COMMON PLEAS COURT

_____

HON. ROBERT P. MILLICH, JUDGE
MUNICIPAL COURT

/s/ Maureen A. Cronin
HON. MAUREEN A. CRONIN, JUDGE
COMMON PLEAS COURT

_____

HON. ELIZABETH A. KOBLY, JUDGE
MUNICIPAL COURT

/s/ John M. Durkin
HON. JOHN M. DURKIN, JUDGE
COMMON PLEAS COURT

/s/ Joseph M. Houser
HON. JOSEPH M. HOUSER, JUDGE
COUNTY COURT NO. 2

/s/ James C. Evans
HON. JAMES C. EVANS, JUDGE
COMMON PLEAS COURT

/s/ Diane Vettori
HON. DIANE VETTORI, JUDGE
COUNTY COURT NO. 3

/s/ Maureen A. Sweeney
HON. MAUREEN A. SWEENEY,
JUDGE
COMMON PLEAS COURT

/s/ David A. D'Apolito
HON. DAVID A. D'APOLITO, JUDGE
COUNTY COURT NO. 4

/s/ Scott D. Hunter
HON. SCOTT D. HUNTER, JUDGE
COUNTY COURT NO. 5

**OVERCROWDING RELEASE
POLICY FOR MAHONING
COUNTY JAIL**

First, all nonviolent misdemeanants confined in lieu of bond awaiting arraignment, held subject to court order or capias warrant. Each such inmate shall be served with a *"Summons After Arrest"* to appear in the appropriate Court at its next regularly scheduled session.

Second, any inmate that is determined not to be indigent and serving time in lieu of payment of fines and costs who has completed serving the initial sentence.

Third, inmates confined for conviction of **nonviolent misdemeanor offenses,** who have served seventy percent (70%) of their sentence, with a priority for those with the fewest remaining days on their sentence. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Fourth, if the release of the inmates under the third category fails to reduce the population to acceptable levels, the Sheriff shall then release any prisoners in the third class who have served at least fifty percent (50%) of their sentence. Priority will be given to those who have completed the highest percentage of their total sentence. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Fifth, all inmates confined for conviction of non-violent misdemeanor offenses with less than fifty percent (50%) of their sentence served shall be furloughed to await re-incarceration, subject to recall from a Jail Waiting List. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Sixth, any inmates confined for conviction for an OUI offense and serving a mandatory sentence shall be released only if they have served the minimum statutory sentence.

Seventh, if the release of the inmates under the sixth category fails to reduce the population to acceptable levels, the Sheriff shall then release any prisoners in the sixth class, with priority being given to those who have completed the highest percentage of their total sentence. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Eighth, any inmates confined for conviction of a **nonviolent, felonies, who is serving time in the county jail** that has completed at least seventy percent (70%) of their sentence, with priority being given to those who have served the greatest percentage of their sentence. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Ninth, if the release of the inmates under the eighth category fails to reduce the population to acceptable levels, then the Sheriff shall release any prisoner in the eighth category who has served at least fifty percent (50%) of their sentence with priority to those prisoners who have completed the highest percentage of their total sentence. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Tenth, all inmates confined for conviction of non-violent felonies, who are serving time in the county jail with less than fifty percent (50%) of their sentence served shall be furloughed to await re-incarceration, subject to recall from a Jail Waiting List. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences.

Eleventh, any inmates incarcerated while awaiting trial in lieu of bond for nonviolent felonies. The inmate shall be furloughed into the Sheriff's Day Reporting Program unless the Judge orders the inmate released on their own recognizance subject to any other conditions imposed by the Trial Court with priority being given to first time offenders.

Twelfth, all violent misdemeanants confined in a post-arraignment status except those charged with domestic violence. Each such inmate shall be released upon service of a summons by Corrections Division Staff, directing the inmate to appear in the Court of Jurisdiction at the time and date previously set by that Court except domestic violence.

Thirteenth, all inmates confined for conviction of violent misdemeanor offenses except those convicted of domestic violence shall be furloughed to await re-incarceration, subject to recall from a Jail Waiting List. Such prisoners shall be required to voluntarily return to the Jail upon notice by the Sheriff to complete their sentences, with the priority given to those who have completed the highest percentage of their total sentence except domestic violence.

Fourteenth, any inmate-confined for conviction of indirect contempt. But, any inmate confined for direct contempt shall not be released.

The Sheriff shall provide a list of all individuals released under this policy to the appropriate Courts by the fifth of each month. Such list shall provide the date of release and what paragraph of the Overcrowding Policy each inmate was release under.

No inmate shall be released who does not fall within one of the above-referenced enumerated steps for release.

EXHIBIT B

## AGREEMENT FOR THE BOARDING OF PRISONERS BETWEEN THE COUNTY OF MAHONING AND THE CITY OF YOUNGSTOWN

This Agreement is entered into this 23 day of Feb., 2007 between the County of Mahoning, Ohio ("County") and the City of Youngstown, Ohio ("City").

Whereas, municipal and county governments are permitted by law to enter into agreements for the provision of services to the public;

Whereas, the Commissioners of the County have adopted Resolution 07–02–029 authorizing this Agreement on behalf of the County; and

Whereas, the Council of the City has adopted Ordinance ORD–07–31 authorizing the Board of Control to execute this Agreement on behalf of the City.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth herein, the parties agree for themselves and their respective successors and assigns as follows:

1. *Purpose and Scope of Services:*
   A. Upon the effective date of this Agreement, the County shall keep and maintain 30 beds available for housing of City prisoners as defined in Section 2 of this Agreement. The County shall keep, board, and maintain up to 30 City Prisoners in the Mahoning County Justice Center and/or the Mahoning County Minimum Security Jail (hereinafter collectively referred to as "County Jail Facilities"). For this period City Prisoners held for direct contempt shall not be counted in the 30 prisoner allotment.
   B. Commencing May 1, 2007 the County shall accept seventy one (71) City Prisoners for incarceration in the County Jail Facilities as de-

fined in Section 2 of this Agreement.

C. Commencing August 1, 2007, or upon full operation whichever is earlier, the County shall (1) have County Jail Facilities fully staffed and operating at the maximum capacity and (2) accept all City Prisoners not to exceed two hundred and twenty one (221).

C. The City recognizes and agrees that the County may hold Federal Prisoners in the County Jail Facilities to the extent otherwise consistent with this Agreement. But the County agrees that it will give first priority to City Prisoners up to the maximum capacity of federal prisoners eligible to be held on any given day.

2. *City Prisoner Defined:*

A. "City Prisoner" shall be defined as any prisoner accepted for booking or judicially ordered confined in the County Jail Facilities by judges of the Youngstown Municipal Court as a result of a misdemeanor offense that occurred or allegedly occurred in the City of Youngstown whether charged under City ordinance or state law.

B. Those prisoners who are charged with felony offenses and City charges on a concurrent basis shall not be counted as City Prisoners except when confinement for felony charges is not required (i.e., because of bond or case disposition status) but confinement under the misdemeanor(s) continues by order of the Youngstown Municipal Court.

C. Those prisoners initially charged with felony offenses which are reduced to misdemeanor offenses or dismissed in the Youngstown Municipal Court will be regarded as City Prisoners from the initial date of booking.

D. Those prisoners confined under City charges and misdemeanor charges of some other jurisdiction shall be counted as City Prisoners during any time that their confinement is required solely by order of the Youngstown Municipal Court.

E. Those prisoners who are confined under City charges and misdemeanor charges of some other jurisdiction shall be counted as a City Prisoner if an order from the Youngstown Municipal Court prevents the County from transferring custody of the prisoner to the other jurisdiction. At such time as the other jurisdiction takes custody of the prisoner, the prisoner will no longer be counted in the then current allotment of City Prisoners. The County will make reasonable efforts to notify the Youngstown Municipal Court of any new significant criminal charges or detainers that are filed against a City Prisoner.

3. *Cost Per City Prisoner:*

A. For each City Prisoner up to seventy-one (71) per day as applicable under the terms herein, the City shall pay the cost of meals and the cost of medical services not covered under the terms of the County's Medical Services Agreement. The terms of coverage and rates for medical services of City Prisoners negotiated by County shall mirror those for County Prisoners.

B. For each City Prisoner housed in excess of seventy-one (71) prisoners per day the City agrees to pay the same per diem-per prisoner amount that is paid by the federal government for the housing of fed-

eral inmates under the County's Intergovernmental Agreement with the federal government. The parties recognize that this agreement can change from time to time. The present agreement provides for a per diem in the amount of $68.84; a copy is attached hereto as Exhibit 1 and incorporated herein by reference.

4. *Medical Services:*

  A. As provided in section 3A of this Agreement the County agrees to provide City Prisoners with the same level of medical care and services provided all other prisoners. And the City agrees to pay the actual medical costs of City Prisoners that are not covered under the County's present Medical Services Agreement attached hereto as Exhibit 2 and incorporated herein by reference.

  B. The County agrees to promptly notify the Sentencing Judge of all medical cases requiring removal of a City Prisoner from the County Jail Facilities. If the Sentencing Judge is unavailable, the Mahoning County Sheriff shall notify the Administrative Judge of the Youngstown Municipal Court. If emergency medical services are required the notification shall be as soon as possible. If non-emergency medical services are required prior notice shall be made prior to removal of a City Prisoner. All costs associated with hospital or health care services provided outside County Jail Facilities will be reimbursed by the City if not covered under the County's Medical Services Agreement. In the event Mahoning County is a party to any contract that provides discounted rates from medical providers or facilities for treatment of jail inmates provided outside County jail facilities, the City of Youngstown will be afforded the same discounts.

  C. The County shall provide guarding of City prisoners receiving medical treatment outside the Mahoning County Jail which does not result in the admission of said prisoner for more than one overnight stay ending prior to 12:00 noon of the following day. By mutual agreement, the Youngstown Police Department will be given at least six (6) hours notice by the Sheriff that the sheriff will cease guard services when more than one overnight stay will be required. The purpose of such notice is to give the City an opportunity to provide a city officer to guard such City Prisoner(s). Unless and until the City responds by providing said officer for guarding, the County agrees to continue to guard said prisoner(s), and the City agrees to reimburse the County for the wages paid to guard the city prisoner for more than the first night's stay as defined above.

5. *Billing:*

  At the end of March, June, September, and December, the County shall submit to the City an itemized statement certified by the Sheriff of the County or his designees, showing the name of the City Prisoner, dates of days confined in the County Jail Facilities, the number of days billed, charges billed, and the amount due from the City for each City Prisoner's confinement under this Agreement. All billings, less any credits directly related to the Agreement, are due to the County and shall be paid within thirty (30) days of receipt.

6. *Daily Prisoner List*

The Mahoning County sheriff shall provide a list of all City Prisoners on a daily basis to the Youngstown, Municipal Court Judges.

7. *Prisoner Release Order:*

The City and the County recognize and agree that the Sheriff has the obligation and authority to refuse to accept or to release any City Prisoner when such act is necessary to comply with any Prisoner Release Ordered by the Court in *Roberts v. Mahoning County,* U.S. District Court Case No. 4:03cv2329 which is/are incorporated herein by reference. But the County agrees that City Prisoners will not be refused acceptance or released to the extent such City Prisoners are held consistent with this Agreement.

8. *Budget and Funding*

The Parties agree that the Board of Commissioners and City Council and the Board of Control will provide funding to ensure full compliance with this Agreement.

9. *Criminal Justice Working Group*

For purposes of encouraging an efficient delivery of services pursuant to this Agreement and any related impact upon the judicial system and law enforcement services of Youngstown and Mahoning County the parties will reinstitute periodic meetings of the Criminal Justice Working Group ("CJWG"). The CJWG shall meet as least monthly for the purpose of resolving any difference that may arise pursuant to this Agreement or to recommend procedural changes that will benefit the parties.

10. *Modification:*

It is understood that terms of this Agreement may only be modified in writing by the mutual consent of the parties and as approved by the court in *Roberts v. Mahoning County,* U.S. District Court Case No. 4:03cv2329.

11. *Transportation:*

The City remains responsible for the transportation of City Prisoners to City courts.

12. *Term:*

The term of this contract shall be for three (3) years.

IN WITNESS WHEREOF, we have set our hands this 23 day of Feb., 2007.

CITY OF YOUNGSTOWN

---

APPROVED AS TO FORM:

/s/ Iris Torres Guglucello
Iris Torres Guglucello, Esq.
Law Director
City of Youngstown

COUNTY OF MAHONING

/s/ Anthony T. Traficanti
Commissioner Anthony T. Traficanti

/s/ Jay Williams
Mayor Jay Williams

/s/ David Bozanich
David Bozanich, Finance Director

/s/ Iris Torres Guglucello
Iris Torres Guglucello, Law Director

APPROVED AS TO FORM:

/s/ Linette M. Stratford
Linette M. Stratford, Esq.
Chief Assistant Prosecutor
Civil Division, Mahoning County
Prosecutor's Office

COUNTY OF MAHONING

/s/ Anthony T. Traficanti
Commissioner Anthony T. Traficanti

/s/ John A. McNally
Commissioner John A. McNally

/s/ David Ludt
Commissioner David Ludt

/s/ Randall A. Wellington
Sheriff Randall A. Wellington

## CERTIFICATE OF DIRECTOR OF FINANCE

I hereby certify that payment will be made on invoices issued to the City of Youngstown under this Agreement, and that sufficient money is in the treasury or in the process of collection to the credit of the appropriate fund or division to discharge the City's obligation under this Agreement.

/s/ David Bozanich
Finance Director

EXHIBIT 1

**U.S. Department of Justice**
United States Marshals Service

**Modification of Intergovernmental Agreement**

| 1. MODIFICATION NO. TWO (2) | 2. REQUEST FOR DETENTION SERVICES NO. 0014-04 | 3. EFFECTIVE DATE OF MODIFICATION October 1, 2003 |
|---|---|---|

| 4. ISSUING OFFICE | 5. LOCAL GOVERNMENT | 6. IGA NO. 60-01-0027 |
|---|---|---|
| U.S. MARSHALS SERVICE PRISONER SERVICES DIVISION WASHINGTON, D.C. 20530-1000 | Mahoning County Sheriff's Department 110 Fifth Avenue Youngstown, OH 44503 | 7. FACILITY CODE(S) 5DT |

| 8. ACCOUNTING CITATION 15X1020 | 9. ESTIMATED ANNUAL PAYMENT |
|---|---|

10. EXCEPT AS PROVIDED SPECIFICALLY HEREIN, ALL TERMS AND CONDITIONS OF THE IGA DOCUMENT REFERRED TO IN BLOCK 5, REMAIN UNCHANGED. TERMS OF THIS MODIFICATION:

The purpose of this modification is to increase the per diem rate of $67.00 to a per diem rate of $68.84, effective October 1, 2003. This rate adjustment is in accordance with the United States Marshals Service, Program Review Team's September 2003 audit of the Intergovernmental Agreement between the United States Marshals Service and the Mahoning County Justice Center. The rate adjustment shall remain in effect for a period of twelve months, expiring on September 30, 2004.

11. INSTRUCTIONS TO LOCAL GOVERNMENT FOR EXECUTION OF THIS MODIFICATION:

A. ☐ LOCAL GOVERNMENT IS NOT REQUIRED TO SIGN THIS DOCUMENT

B. ☒ LOCAL GOVERNMENT IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 2 COPIES TO U.S. MARSHAL

12. APPROVAL

| A. LOCAL GOVERNMENT | B. FEDERAL GOVERNMENT |
|---|---|
| Signature | Dennis Jenkins  Signature |
| President  TITLE  1/22/04  DATE | Acting Chief  TITLE  DEC - 5 2003  DATE |

**IN WITNESS WHEREOF,** the parties hereto have set their hands on the date as indicated.

ATTEST:

/s/ Nancy M. Laboy

Date: 1-22-04

MAHONING COUNTY COMMISSIONERS

/s/ Edward Reese
EDWARD REESE, PRESIDENT

/s/ David Ludt
DAVID LUDT

/s/ Vicki Allen Sherlock
VICKI ALLEN SHERLOCK

DATE: _____

APPROVED AS TO FORM

/s/ _____
MAHONING COUNTY ATTORNEY

### JOURNAL ENTRY

#### JE 03–1116

It was moved by Mrs. Sherlock, and seconded by Mr. Ludt, that the Board of Mahoning County Commissioners does hereby enter into an agreement with Corrections Corporation of America to house federal inmates pursuant to the U.S. Department of Justice/Marshal Services Intergovernmental Agreement and ORC 9.07.

A copy of said agreement is on file in the Office of the Mahoning County Commissioners, 21 W. Boardman Street, Suite 200, Youngstown, Ohio 44503.

Roll call voting resulted: Mr. Ludt: aye
Mrs. Sherlock: aye
Mr. Reese: aye

Motion carried this 21st day of November, 2003.

/s/ Edward J. Reese
EDWARD J. REESE,
PRESIDENT OF THE BOARD

ATTEST:

/s/ James M. Fortunato
JAMES M. FORTUNATO,
ACTING CLERK OF THE BOARD

JR. VOL. 91, PAGE 891

cc: Gary Kubic
Special Projects
Sheriff

### INCARCERATION AGREEMENT BETWEEN MAHONING COUNTY AND CORRECTIONS CORPORATION OF AMERICA

This Agreement is hereby entered into between Corrections Corporation of America (CCA) and Mahoning County, Ohio (the County) as of November 21, 2003.

**WHEREAS,** the County is party to an Intergovernmental Service Agreement ("IGA") with the United States Marshals Service ("USMS") to house federal inmates, a copy of which is attached hereto as Exhibit 1 and incorporated herein by reference;

**WHEREAS,** CCA owns Northeast Ohio Correctional Facility ("CCA Facility") in Ohio and desires to house federal inmates at the Facility;

**WHEREAS,** the USMS need for inmate beds exceeds the capacity of Mahoning County Justice Center ("MCJC"); and

**WHEREAS,** CCA has available space at the CCA Facility;

**NOW THEREFORE,** the parties agree as follows:

1. The parties understand that this Agreement is subject to the provisions of the Amended Agreement between The City of Youngstown, Ohio and CCA of America pursuant to Ohio Revised Code § 9.07 and the Development Agreement (collectively "9.07 Agreement") a copy of which is attached hereto as Exhibit 2 and incorporated herein by reference. The parties agree that the 9.07 Agreement

shall supercede this Agreement in the event of a conflict in terms.

2. Upon reaching a population of 200 federal inmates in the MCJC, the County will house any additional USMS inmates received pursuant to the IGA in the CCA Facility unless CCA does not accept said inmates in accordance with paragraph 3 below. The County shall have the option to offer federal inmates to CCA prior to reaching the 200 inmate threshold at the MCJC but shall have no obligation to do so. CCA shall provide services for federal inmates housed in its Facility in compliance with the terms of the IGA.

3. The County will not amend, terminate or otherwise change the terms of the IGA without advance notice to CCA. CCA is not obligated to accept USMS federal inmates from the County at the CCA Facility if space is not available or if the IGA is materially changed to CCA's detriment without CCA's approval or if the acceptance of the inmates would be financially impractical for CCA as determined by CCA.

4. CCA shall indemnify, defend and save harmless the County, its agents, employees, and representatives from and against any and all suits, actions, claims, demands, damages or losses arising from CCA's operation of the CCA Facility. CCA expressly recognizes that such duty to indemnify, defend and save harmless is inclusive of CCA's duty to indemnify, defend and save harmless the County, its agents, employees, and representatives as set forth in the 9.07 Agreement to which the County, its agents, employees and representatives are contractual third party beneficiaries.

5. The County will pay CCA the per diem fee paid to the County pursuant to the IGA less an administrative fee per inmate for each federal inmate housed at CCA pursuant to this Agreement and the IGA. As of the execution of this Agreement, the per diem amount under the IGA is $67.00 and the County's administration fee shall be $1.00. If the per diem set forth in the IGA increases above $67.00, the fee shall increase by an equal amount but shall not exceed $3.00. CCA agrees to submit the necessary documentation for payment to the County as set forth in the IGA. The County will pay amounts due to CCA within thirty (30) days after receipt of funds. To the extent allowed under the IGA, CCA will be designated Payee and funds due pursuant to the IGA will be paid directly to CCA. In such instance, CCA will deduct the administrative fee and forward that amount to the County within thirty (30) working days of receipt of funds.

6. During the term of this Agreement, CCA shall not execute a direct agreement with the United States Marshal for the Northern District of Ohio to house inmates detained under the authority of that Marshal if such an agreement would place CCA in competition with the County facility and would prevent the County from housing such inmates. This provision shall not apply if the County is housing a comparable number of federal inmates at a per diem equal to or greater than the per diem set forth in the IGA or if the County elects to no longer make beds available to the Marshal or otherwise if such direct agreement would not be to the County's detriment.

7. The term of this Agreement shall commence on November 21, 2003 and shall be for an initial period of five (5) years with three options to renew for five years each upon mutual agreement of the parties.

8. Either party may terminate this Agreement if a breach of this Agreement by the other party remains uncured for

thirty (30) days after the date of notice of said breach.

9. The failure of performance of any of the terms and conditions of this Agreement resulting from acts of God, war, civil insurrection or not shall not be a breach. This provision does not include those acts of insurrection or riot that are caused by the by the federal inmates or as a result of the negligence of the employees or agents of CCA.

10. The provisions of this Agreement are for the sole benefit of the parties hereto and shall not be construed as conferring any rights on any other person or entity.

11. This Agreement shall be interpreted by the laws of the State of Ohio, and courts within Ohio shall preside over any legal action filed to enforce or interpret this Agreement.

12. This Agreement shall not be altered, changed or amended except in writing executed by both parties.

13. This Agreement incorporates all the agreements, covenants and understandings between the parties. Other than the 9.07 Agreement and IGA Agreement, no prior contract or understandings, verbal or otherwise, of the parties and/or their agents shall be valid or enforceable unless embodied in this Agreement.

14. All notices sent pursuant to this Agreement shall be sent certified mail, return receipt requested to:

County: Gary Kubic
Mahoning County Administrator
21 West Boardman Street
Suite 200
Youngstown, Ohio 44503

John A McNaily, IV

Law Director
City of Youngstown
26 South Phelps Street
Youngstown, Ohio 44503

Randall A. Wellington
Mahoning County Sheriff
110 5th Avenue
Youngstown, Ohio 44603

CCA: G. A. Puryear IV, General Counsel
Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, TN 37215

15. No waiver of any breach of any of the terms or conditions of this Agreement shall be a waiver of any other or subsequent breach; nor shall any waiver be valid or binding unless the same shall be in writing and signed by an authorized representative of the party alleged to have granted the waiver.

MAHONING COUNTY, OHIO (THE COUNTY)

BY: /s/ Edward J. Reese
Edward J. Reese
Mahoning County Commissioner

BY: /s/ Dave Ludt
Dave Ludt
Mahoning County Commissioner

BY: Vicki Allen Sherlock
Vicki Allen Sherlock
Mahoning County Commissioner

CORRECTIONS CORPORATION OF AMERICA (CCA)

BY: /s/ Damon Hininger
Damon Hininger
Vice President, Federal Customer Relations

APPROVED AS TO FORM:

/s/ Linette M. Stratford
Mahoning County Prosecutor's Office

EXHIBIT 2

## FINANCIAL CERTIFICATION

To meet the obligation of this contract, I hereby certify that funds in the amount of *1·00* dollars have been appropriated and are in the Treasury, or in the process of collection, to the credit of the *general* Fund of Mahoning County and are free of encumbrance for any other purpose.

Purchase Order Number *POCEH- 13896*
Vendor Number *104128*
Vendor Name *Health Professionals, Ltd*
Ref. Account Number *100- 10500- 65003*

*\* No funds are being certified at this time as there is no obligation for calendar year 2006. Contract is effective 1-1-07 → the entire estimate 2007 obligation will need encumbered/certified at that time*

*\* N/A*

Michael V. Sciortino, Auditor
Mahoning County, Ohio

| [INTERNAL USE] | |
|---|---|
| Term of Contract: | *2 years* |
| Dates of Term if Appl. | *1-1-07 thru 12-31-08* |
| Fixed or Unit Pricing | *unit pricing* |
| Multi-Year Contracts: | |
| Total Contract | *estimate* |
| Prev. Certified | |
| This Certification | |
| To Be Certified-Future | *full 2007 oblig.* |

Date *12-5-06*

EXHIBIT **2**

### RESOLUTION OF AWARD

#### RES 06–12–002

WHEREAS, the Board of Mahoning County Commissioners advertised for bids to be received until 2:30 p.m., Wednesday, October 18, 2006, for Comprehensive Health Services for Inmates.

WHEREAS, bids were received, read and recorded on that date and taken under advisement pending the recommendation of Robert Knight, Health Administrator/Contact Monitor.

NOW, THEREFORE BE IT RE-SOLVED, upon the certification of County Auditor and approval of County Prosecutor, that the Board of Mahoning County Commissioners awards the bids to:

HEALTH PROFESSIONALS, LTD

9000 N. Lindbergh

Peoria, IL 61615

Proposal No. 1–per unit pricing

2 year contract with optional 3rd and 4th year renewals

(Effective January 1, 2007)

A copy of said agreement is on file in the Office of the Mahoning County Commissioners, 21 W. Boardman Street, Youngstown, Ohio 44503.

It was moved by Mr. McNally, and seconded by Mr. Ludt, that the foregoing Resolution be approved this 7th day of December, 2006.

Roll call voting resulted: Mr. Ludt: aye
Mr. McNally: aye
Mr. Traficanti: aye

**WHEREUPON,** the President of the Board declared the foregoing Resolution be duly adopted this 7th day of December, 2006.

/s/ Nancy M. Laboy
NANCY M. LABOY,
CLERK OF THE BOARD

JR. VOL. 94, PAGE 812

cc: Auditor
Jail Medical/
Health Professionals, LTD
Purchasing

AGREEMENT OF AWARD

THIS AGREEMENT MADE this *1st* day of *January, 2007.* Between the COUNTY COMMISSIONERS OF MAHONING COUNTY, hereinafter called the party of the first part, and HEALTH PROFESSIONALS, LTD., the Vendor, hereinafter called the party of the second part.

WITNESSETH: That for and in consideration of payments hereinafter mentioned, and to be made by the party of the first part, party of the second part agrees to furnish the following:

*BID PROPOSAL NO. 1. Mahoning county justice center/min security jail Bid Proposal No. 1 is for Comprehensive Medical Services for Inmates with the bidder quoting prices based on the fact that Mahoning County will assume no financial responsibility for catastrophic incidents, and the bidder will use its own network vendors for Pharmacy, Radiology, Lab Services, Nurses, etc.* A copy of said Bid Proposal is attached hereto as "Attachment A" and the party of the second part further agrees to the provisions set forth in the General Provisions and Conditions attached hereto as "Attachment B"(excluding all information in Appendix A) which are made a part hereof as through fully written herein. Further, the parties agree that the quotation, proposal, and other contract documents are incorporated herein by that reference as through fully rewritten herein. The parties agree that the Affidavit required by Section 5719.042 of the Ohio Revised Code, which affidavit consists of one page, and has heretofore executed on the *1st* day of *January, 2007,* and which affidavit was signed by *Theresa S. Falcon–Cullinan, M.D.,* who is *Chief Executive Officer* of *HEALTH PROFESSIONALS, LTD.,* is hereby incorporated into this document as through full re-written herein. A copy of said affidavit is appended hereto as "Attachment C".

The parties agree to also include the Terms and Conditions listed in "Attachment D" attached hereto.

In consideration of the foregoing promises, the party of the first part agrees to the party of the second part, the sum of *In accordance with bid proposal No. 1.*

IN WITNESS WHEREOF, the parties hereto have set their hands on the date as indicated.

ATTEST:

/s/ Nancy M. Laboy

MAHONING COUNTY COMMISSIONERS:

/s/ Anthony T. Traficanti

/s/ John A. McNally

/s/ David Ludt

Date: 12–7–16

CONTRACTOR

BY: /s/ Theresa S. Falcon-Cullinan, M.D.
Theresa S. Falcon-Cullinan, MD., MBA
*Chief Executive Officer*

Date: 11–29–06

Witness:

/s/ Christina M. Snyder
*Health Professionals, Ltd.*

I hereby certify that the follow agreement is approved as to form:

/s/ _____

Attorney for the County

Date: 12/5/06

The undersigned, being familiar with the instruction, specifications, provisions and narrative for the contract for Comprehensive Medical Services for inmates at the Mahoning County Justice Center and Mahoning County Minimum Security Jail; hereby proposes to provide the services as designated within these documents at the following prices:

*BID PROPOSAL NO. 1—MAHONING COUNTY JUSTICE CENTER/ MINIMUM SECURITY JAIL*

Bid Proposal No. 1 is for Comprehensive Medical Services for Inmates with the bidder quoting prices based on the fact that Mahoning County will assume no financial responsibility for catastrophic incidents, and the bidder will use its own network vendors for Pharmacy, Radiology, Lab Services, Nurses, etc.

| Price of First Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $118,943.14 |
| | 301–350 | $120,326.82 |
| | 351–400 | $123,082.67 |
| | 401–450 | $125,845.18 |
| | 451–500 | $128,595.43 |
| | 501–550 | $131,361.96 |
| | 551–600 | $147,061.44 |
| | 601–650 | $149,806.58 |
| | 651–700 | $152,570.83 |
| | Above 700 | To be negotiated |

| Price of Second Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $122,511.44 |
| | 301–350 | $123,935.63 |
| | 351–400 | $126,775.15 |
| | 401–450 | $129,620.53 |
| | 451–500 | $132,453.29 |
| | 501–550 | $135,302.81 |
| | 551–600 | $151,473.28 |
| | 601–650 | $154,300.78 |
| | 651–700 | $157,147.96 |
| | Above 700 | To be negotiated |

| Optional Third Year | ADP | Monthly Base Compensation |
|---|---|---|
| (one year renewal) | 0–300 | $126,186.78 |
| | 301–350 | $127,654.72 |
| | 351–400 | $130,578.40 |
| | 401–450 | $133,509.15 |
| | 451–500 | $136,426.89 |
| | 501–550 | $139,361.90 |
| | 551–600 | $156,017.48 |
| | 601–650 | $158,929.80 |
| | 651–700 | $161,862.39 |
| | Above 700 | To be negotiated |

| Optional Fourth Year | ADP | Monthly Base Compensation |
|---|---|---|
| (One year renewal) | 0–300 | $129,972.38 |
| | 301–350 | $131,484.37 |
| | 351–400 | $134,495.75 |
| | 401–450 | $137,514.43 |
| | 451–500 | $140,519.70 |
| | 501–550 | $143,542.76 |
| | 551–600 | $160,698.00 |
| | 601–650 | $163,697.70 |
| | 651–700 | $168,718.27 |
| | Above 700 | To be negotiated |

*ALTERNATE BID PROPOSAL NO. 2— MAHONING COUNTY JUSTICE CENTER/ MINIMUM SECURITY JAIL*

Bid Proposal No. 1–is for Comprehensive Medical Services for Inmates with the bidder quoting prices based on the fact that Mahoning County agrees having an aggregate capitation for all offsite care and hos-

pitalization. In addition, and the bidder will use its own network vendors for Pharmacy, Radiology, Lab Services, Nurses, etc.

The aggregate cap will be $150,000 per year for offsite care and hospitalization. Mahoning County will be responsible for 25% of the cost sharing for expenses over $150,000 per year for offsite care and hospitalization.

| Price of First Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $118,530.92 |
| | 301–350 | $119,872.56 |
| | 351–400 | $122,563.25 |
| | 401–450 | $125,251.24 |
| | 451–500 | $127,946.06 |
| | 501–550 | $130,628.71 |
| | 551–600 | $146,252.20 |
| | 601–650 | $148,945.75 |
| | 651–700 | $151,636.99 |
| | Above 700 | To be negotiated |

| Price of Second Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $122,086.84 |
| | 301–350 | $123,468.74 |
| | 351–400 | $126,240.14 |
| | 401–450 | $129,008.78 |
| | 451–500 | $131,784.44 |
| | 501–550 | $134,547.57 |
| | 551–600 | $150,639.77 |
| | 601–650 | $153,414.12 |
| | 651–700 | $156,186.10 |
| | Above 700 | To be negotiated |

| Optional Third Year | ADP | Monthly Base Compensation |
|---|---|---|
| (one year renewal) | 0–300 | $125,749.45 |
| | 301–350 | $127,172.80 |
| | 351–400 | $130,027.35 |
| | 401–450 | $132,879.04 |
| | 451–500 | $135,737.97 |
| | 501–550 | $138,584.00 |
| | 551–600 | $155,158.96 |
| | 601–650 | $158,016.55 |
| | 651–700 | $160,871.68 |
| | Above 700 | To be negotiated |

| Optional Fourth Year | ADP | Monthly Base Compensation |
|---|---|---|
| (one year renewal) | 0–300 | $129,521.93 |
| | 301–350 | $130,987.99 |
| | 351–400 | $133,928.17 |
| | 401–450 | $136,865.41 |
| | 451–500 | $139,810.11 |
| | 501–550 | $142,741.51 |
| | 551–600 | $159,813.73 |
| | 601–650 | $162,757.04 |
| | 651–700 | $165,697.83 |
| | Above 700 | To be negotiated |

## ALTERNATE BID PROPOSAL NO. 3—MAHONING COUNTY JUSTICE CENTER/ MINIMUM SECURITY JAIL

Bid Proposal No. 3 is for Comprehensive Medical Services for Inmates with the bidder quoting prices based on the fact that Mahoning County agrees having an aggregate capitation for all offsite care and hospitalization. In addition, and the bidder will use its own network vendors for Pharmacy, Radiology, Lab Services, Nurses, etc.

The aggregate cap will be $150,000 per year for offsite care and hospitalization. Mahoning County will be responsible for 50% of the cost sharing for expenses over $150,000 per year for offsite care and hospitalization.

| Price of First Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $118,109.29 |
| | 301–350 | $119,418.31 |
| | 351–400 | $122,043.82 |
| | 401–450 | $124,666.78 |
| | 451–500 | $127,287.17 |
| | 501–550 | $129,905.00 |
| | 551–600 | $145,453.71 |
| | 601–650 | $148,074.15 |
| | 651–700 | $160,703.15 |
| | Above 700 | To be negotiated |

| Price of Second Year | ADP | Monthly Base Compensation |
|---|---|---|
| | 0–300 | $121,652.57 |
| | 301–350 | $123,000.86 |
| | 351–400 | $125,705.14 |
| | 401–450 | $128,406.78 |
| | 451–500 | $131,105.79 |
| | 501–550 | $133,802.15 |
| | 551–600 | $149,817.32 |
| | 601–650 | $152,516.37 |
| | 651–700 | $155,224.24 |
| | Above 700 | To be negotiated |

| Optional Third Year | ADP | Monthly Base Compensation |
|---|---|---|
| (one year renewal) | 0–300 | $126,302.14 |
| | 301–350 | $126,690.88 |
| | 351–400 | $129,476.29 |
| | 401–450 | $132,258.99 |
| | 451–500 | $135,638.96 |
| | 501–550 | $137,816.22 |
| | 551–600 | $154,311.84 |
| | 601–650 | $157,091.87 |
| | 651–700 | $159,880.97 |
| | Above 700 | To be negotiated |

Monthly Base

| Optional Fourth Year | ADP | Compensation |
|---|---|---|
| (One year renewal) | 0–300 | $129,061.21 |
| | 301–350 | $130,491.61 |
| | 351–400 | $133,360.58 |
| | 401–450 | $136,226.76 |
| | 451–500 | $139,090.13 |
| | 501–550 | $141,950.70 |
| | 551–600 | $158,941.19 |
| | 601–650 | $161,804.62 |
| | 651–700 | $164,677.40 |
| | Above 700 | To be negotiated |

## CONTRACT START–UP

HPL will be flexible in the number of days required from contract award to start-up. However, our normal period of time to assure full and complete transition is:

### 30 days

## VI. SIGNATURE OF BIDDERS

This proposal is in accordance with the specifications provided by the County. This bid is submitted subject to the terms and conditions contained in this contract packet and further subject to any and all applicable provisions of the Ohio Revised Code.

Accompanying this Proposal is a Bid Bond (or Certified Check) in the amount of $102,000.00

Should the undersigned be the successful bidder, it is hereby proposed that the items bid shall be furnished within 30 days following the execution of the contract.

IF AN INDIVIDUAL, SIGN BELOW:

NAME

ADDRESS

IF A PARTNERSHIP, SIGN BELOW:

NAME

ADDRESS

\* Print or type name of Affiant
\*\* Print or type office (president, etc.) of Affiant

IF A CORPORATION, SIGN BELOW:

Health Professionals, LTD

NAME OF CORPORATION

9000 N. Lindbergh Drive

ADDRESS

Peoria, Illinois

SIGNATURE OF OFFICER

TITLE OF OFFICER SIGNING

THE ABOVE–SIGNED INCORPORATED UNDER THE LAWS OF THE STATE OF:

Illinois

Type or Print State of Incorporation

## VII. NON–COLLUSION AFFIDAVIT

STATE OF Illinois

COUNTY OF Peoria

Theresa S. Falcon–Cullinan, M.D.\*, being first duly sworn, deposes and says that she is Chief Executive Officer \*\* of Health Professionals, LTD \*\*\*, the party who made the foregoing proposal or bid; that it was genuine and not collusive; that said bidder did not collude, conspire, connive, or agree, directly or indirectly, with any bidder or other person, that such other bidder or person should refrain from bidding, or submit a sham bid; further, such bidder did not in any manner, directly or indirectly, seek by any agreement or collusion, or communication or conference with any person, to fix the bid price of either Affiant or any other bidder or to fix any overhead, profit, or cost clement of the bid price of not collude, conspire, or agree to

\*\*\* Print or type name of firm submitting bid

secure any advantage against the County of Mahoning, or any person interested in the proposed or bid, are true to the best of Affiant's knowledge and belief. Affiant further says that Affiant did not, directly or indirectly, submit this bid, or the contents thereof, or divulge information or data relative thereto to any other bidder or association, or to any agent or member thereof.

/s/ Theresa S. Falcon-Cullinan, M.D.
SIGNATURE OF AFFIANT

Sworn and subscribed before me this 13th day of October, 2006.

/s/ Christina M. Snyder
SIGNATURE OF NOTARY PUBLIC

A Notary Public in and for Peoria County, Illinois.

My Commission expires 12/05/09.

### VIII. BIDDER'S AFFIDAVIT

STATE OF Illinois

COUNTY OF Peoria

Theresa S. Falcon–Cullinan, M.D.*, being first duly sworn, deposes and says as follows:

1. That the said Affiant is the Chief Executive Officer ** of Health Professionals, LTD ***, the firm or corporation submitting the attached proposal or bids:

2. That the facts contained in the proposal submitted herewith are true to the best of Affiant's knowledge and belief, and that Affiant has made no material misstatements of fact in order to secure and advantage over other bidders or for any other reason.

3. That the bid herewith, submitted by the bidder, complies in full with the

* Type or print name of Affiant
** Type or print office Affiant occupies

specifications promulgated by the County, and that any deviations from those specifications are specifically set forth in the proposal or an attachment appended thereto.

/s/ Theresa S. Falcon-Cullinan, M.D.
SIGNATURE OF AFFIANT

Sworn and subscribed before me this 13th day of October, 2006.

/s/ Christina M. Snyder
SIGNATURE OF NOTARY PUBLIC

A Notary Public in and for Peoria County, Illinois.

My Commission expires 12/05/09.

### IX. DELINQUENT TAX AFFIDAVIT

STATE OF Illinois

COUNTY OF Peoria

TO: THE AUDITOR OF MAHONING COUNTY, OHIO

Theresa S. Falcon–Cullinan, M.D., being first duly sworn, deposes and says as follows:

1. Affiant is Chief Executive Officer of Health Professionals, LTD, the business entity that has submitted to the Mahoning County Board of Commissioners, a proposal for _____ in the amount of $_____.

2. That, at the time that the aforesaid proposal was submitted, that date being October 18, 2006, the said business entity:

*** Type or print name of firm submitting bid

**PLEASE CHECK EITHER A OR B**

_____ A.  was charged with delinquent personal property taxes on the general tax list of personal property of the County of Mahoning, State of Ohio, in the amount of $_____. Further, the said business entity is charged with interest and penalties in the amount of $_____.

OR.

__X__ B.  was not charged with any delinquent personal property taxes on the general tax list of personal property of the County of Mahoning, State of Ohio.

And further Affiant sayeth not.

10-13-06
Date

ATTEST:

/s/ Christina M. Snyder

/s/ Theresa S. Falcon-Cullinan, M.D.
Signature of Affiant

Health Professionals, LTD
Name of Business

9000 N. Lindbergh Dr.
Business Address

Peoria, Illinois 61615
City, State, Zip Code

37-1347484
Personal Property Tax
Account Number (Must be Completed)

## X.  CHECKLIST

EACH BIDDER _MUST_ COMPLETE AND/OR SUBMIT THE FOLLOWING, OR THE BID MAY BE DEEMED IRREGULAR AND REJECTED:

1. BID BOND (Attached by paperclip to the front of the Bid)

2. PROPOSALS (1 through 4 and CONTRACT START–UP)

3. SIGNATURE OF BIDDERS

4. BIDDER'S AFFIDAVIT

5. NON–COLLUSION AFFIDAVIT

6. DELINQUENT TAX AFFIDAVIT

7. E.E.O. COMPLETION AND SIGNATURE ON FRONT OF ENVELOPE

**AFFIDAVIT**

(Sec. 5719.042 ORC)

STATE OF ILLINOIS

s s.

COUNTY OF PEORIA

TO: THE AUDITOR OF MAHONING COUNTY, OHIO:

_Theresa S. Falcon Cullinan, M.D., MBA,_ being first duly sworn, deposes and says as follows:

1. Affiant is the _Chief Executive Officer_ of _Health Professionals, LTD.,_ the business entity that has submitted to the Board of Mahoning County Commissioners a bid for _Comprehensive Medical Services for Inmates._

2. That, at the time that the aforesaid bid was submitted, that date being _October 18, 2006,_ the said business entity was not charged with any delinquent personal property taxes on the general tax list of personal property of the County of Mahoning, State of Ohio.

And further Affiant sayeth not.

11-29-06
Date

/s/ Theresa S. Falcon-Cullinan, M.D.
Signature of Affiant

Health Professionals, LTD
Name of Business

9000 N. Lindbergh Dr. Suite A

Peoria, Illinois 61615
Business Address

Sworn to before me and subscribed in my present this 29th day of November, 2006.

/s/ Christina M. Snyder
Signature of Notary Public

A Notary Public in and for said County and State.

My Commission Expires 12-05-09.

## PERFORMANCE BOND

### Bond # 5014658

KNOW ALL MEN BY THESE PRESENTS:

THAT WE Health Professionals, LTD, as principal, and Bond Safeguard Insurance Company, as sureties, are held and firmly bound unto the State of Ohio for the use of Mahoning County in the penal sum of One Million Five Hundred Forty Three Thousand, One Hundred Forty Five 00/100 * * * * * * * * * ($ 1,543,145.00 * * *) for the payment of which, well and truly to he made, we hereby jointly and severally bind ourselves, our heirs, executors, administrators, successors, and assigns.

THE CONDITION OF THIS OBLIGATION ARE SUCH THAT:

WHEREAS, said principal has heretofore filed with the Mahoning County Commissioners a written bid or proposal for Professionals Health Services

WHEREAS, said Mahoning County Commissioners have accepted said bid or proposal and have awarded to said principal the contract for supplying the items named in said bid or proposal.

NOW, if the principal shall well, truly, and faithfully comply with and perform each and all of the terms, covenants, and conditions of such contract on _____ part to be kept, performed according to the terms thereof, and within the time prescribed, then this obligation shall be void, otherwise the same shall remain in full force and effect; it being expressly understood and agreed that liability of the surety for any or all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated.

The said sureties hereby stipulate and agree that any failure to complete the terms of the contract at the time named in the contract, or extensions of time, or modifications, omissions, or additions in or to the terms of said contract, or in or to the specifications, shall not in any ways affect the obligations of said sureties or their bond.

Signed this 5th day of December, 2006.

IN THE PRESENCE OF:

Health Professionals, LTD
PRINCIPAL OR CONTRACTOR

By/s/ _____

IN THE PRESENCE OF:

Bond Safeguard Insurance Company
NAME OF SURETY

By/s/ Ted Sherman
Ted Sherman/Attorney-in-Fact

We hereby approve and accept the foregoing bond and sureties here on this the 7th day of December, 2006.

ATTEST:

/s/ Nancy M. Laboy

MAHONING COUNTY COMMISSIONERS

Anthony T. Traficanti

/s/ John A. McNally

/s/ David Ludt

APPROVED AS TO FORM:

/s/ _____

MAHONING COUNTY PROSECUTOR

COMMISSIONERS' JOURNAL VOLUME 94, PAGE 812.

Regardless of the Contract Term, it is understood and agreed to by the Obligee that this bond is being tendered for a period of two (2) years from it's effective date of January 1, 2007 and expiring December 31, 2008.

## POWER OF ATTORNEY

### AO 36858

Bond Safeguard Insurance Company

KNOW ALL MEN BY THESE PRESENTS, that BOND SAFEGUARD INSURANCE COMPANY, an Illinois Corporation with its principal office in Lombard, Illinois, does hereby constitute and appoint: Ted Sherman, Craig Sherman, Judy Blaige, Karen Genoff its true and lawful Attorney(s)–In–Fact to make, execute, seal and deliver for, and on its behalf as surety, any and all bonds, undertakings or other writings obligatory in nature of a bond.

This authority is made under and by the authority of a resolution which was passed by the Board of Directors of BOND SAFEGUARD INSURANCE COMPANY on the 7th day of November, 2001 as follows:

Resolved, that the President of the Company is hereby authorized to appoint and empower any representative of the Company or other person or persons as Attorney–In–Fact to execute on behalf of the Company any bonds, undertakings, policies, contracts of indemnity or other writings obligatory in nature of a bond not to exceed $1,000,000.00, One Million Dollars, which the Company might execute through its duly elected officers, and affix the seal of the Company thereto. Any said execution of such documents by an Attorney–In–Fact shall be as binding upon the Company as if they had been duly executed and acknowledged by the regularity elected officers of the Company. Any Attorney–In–Fact, so appointed, may be removed for good cause and the authority so granted may be revoked as specified in the Power of Attorney.

Resolved, that the signature of the President and the seal of the Company may be affixed by facsimile on any power of attorney granted, and the signature of the Vice President, and the seal of the Company may be affixed by facsimile to any certificate of any such power and any such power or certificate bearing such facsimile signature and seal shall be valid and binding on the Company. Any such power so executed and sealed and certificate so executed and sealed shall, with respect to any bond or undertaking to which it is attached, continue to be valid and binding on the Company.

IN WITNESS THEREOF, BOND SAFEGUARD INSURANCE COMPANY has caused this instrument to be signed by its President, and its Corporate Seal to be affixed this 7th day of November, 2001.

BOND SAFEGUARD INSURANCE COMPANY

BY /s/ David E. Campbell President

David E. Campbell
    President

### ACKNOWLEDGEMENT

On this 7th day of November, 2001, before me, personally came David E. Campbell to me known, who being duly sworn, did depose and say that he is the President of BOND SAFEGUARD INSURANCE COMPANY, the corporation described in and which executed the above instrument that the executed said instrument on behalf of the corporation by authority of his office under the By-laws of said corporation.

/s/ Michele Koller

Michele Koller

Notary Public

### CERTIFICATE

I, the undersigned, Vice President of BOND SAFEGUARD INSURANCE COMPANY, An Illinois Insurance Company, DO HEREBY CERTIFY that the original Power of Attorney of which the foregoing is a true and correct copy, is in

full force and effect and has not been revoked and the resolutions as set forth are now in force.

Signed and Sealed at Lombard, Illinois this 5th Day of Dec. 2006

/s/ Donald D. Buchanan

Donald D. Buchanan
    Secretary

### REQUEST FOR PROPOSALS FOR COMPREHENSIVE HEALTH SERVICES FOR INMATES

DATE:    WEDNESDAY, OCTOBER 18, 2006

TIME:    2:30 PM

PLACE:   MAHONING COUNTY
         ADMINISTRATION BUILDING
         21 W. BOARDMAN STREET
         YOUNGSTOWN, OHIO 44503

### BOARD OF MAHONING COUNTY COMMISSIONERS

### DAVID LUDT

### JOHN MCNALLY

### ANTHONY TRAFICANTI

### ADVERTISEMENT FOR BIDS

Sealed proposals will be received by the Board of Mahoning County Commissioners until *2:30 P.M., Wednesday, October 18, 2006*, at the Mahoning County Purchasing Department, 1st Floor, 21 West Boardman Street, Youngstown, Ohio 44503 and opened and read in the Purchasing Department for:

*COMPREHENSIVE HEALTH SERVICES FOR INMATES MAHONING COUNTY JUSTICE CENTER 110 FIFTH AVENUE, YOUNGSTOWN, OHIO 44503*

A copy of the specifications along with proposal pages may be obtained at the Mahoning County Purchasing Department, Mahoning County Administration Building, and 1st Floor, 21 W. Boardman Street, Youngstown, Ohio.

A PRE–BID MEETING IS SCHEDULED FOR OCTOBER 4, 2006, AT 10:00 A.M., IN THE SHERIFF'S CONFERENCE ROOM, MAHONING COUNTY JUSTICE CENTER, 110 FIFTH AVENUE, YOUNGSTOWN, OHIO 44503.

For all bids in excess of $25,000.00, a certified check representing FIVE percent (5%) of the proposal, drawn on a solvent bank, and payable to the Mahoning County Treasurer, or a bid bond in the sum of FIVE percent (5%) of the proposal in lieu thereof must accompany each and every proposal as a guarantee that if the bid is accepted, a contract will be entered into with the Board of County Commissioners, in the manner provided by law.

A performance bond in the amount of 100% of the contract price will be required at the time the bidder enters into the contract. However, if the item bid is available for immediate delivery and specified as such in the bid, a performance bond will not then be required.

Bids of Corporations not chartered in Ohio *MUST* be accompanied by proper certifications that such Corporation is authorized to do business in Ohio.

Attention of the Bidder is directed to the requirements that each proposal must be accompanied by a non-collusion affidavit, properly executed by the Bidder. Further, the successful Bidder will be required to execute an affidavit required by Sec. 5719.042 of the Ohio Revised Code. No payment shall be made on any Contract for which no such affidavit has been submitted.

The Board of Mahoning County Commissioners reserves the right to reject any or all bids and to waive informalities. In addition, the Board of Mahoning County Commissioners reserves the right to participate in state contracts which the Department of Administrative Services, Of-

fice of State Purchasing has entered into for the purchase of supplies, services, equipment and certain materials pursuant to Ohio Revised Code Section 125.04. No bids may be withdrawn for at least sixty (60) days after the opening thereof. Each bidder must insure that all employees and applicants for employment are not discriminated against because of race, color, sex or national origin.

**CLEARLY INDICATE THE ITEM BEING BID, AS WELL AS THE NAME, ADDRESS AND TELEPHONE NUMBER OF THE PERSON OR BUSINESS SUBMITTING THE BID, ON THE OUTSIDE OF THE SEALED ENVELOPE CONTAINING THE BID.**

MAHONING COUNTY BOARD OF COMMISSIONERS

Nancy Laboy, Clerk of the Board

INSTRUCTIONS TO THE PUBLISHER:

Please publish on : Tuesdays, September 19th, 2006 and September 26th, 2006

Mail three (3) proofs of publication to:

Mahoning County Commissioners
21 West Boardman
Youngstown, Ohio 44503
Vindicator Purchase Order #_PO-CEN12765___

Jr. Vol. 94, Page ——

Account #: MAH427250

Bill To: Mahoning County Commissioners

*JAIL MEDICAL*

I. *INSTRUCTIONS TO BIDDERS*

| | | |
|---|---|---|
| 1.0 | BID IDENTIFICATION | 753 |
| 2.0 | INQUIRIES AND ADDEDNA | 754 |
| 3.0 | DUTIES OF BIDDER | 754 |
| 4.0 | PREPARATION OF PROPOSALS | 754 |
| 5.0 | PERFORMANCE GUARANTEES | 755 |
| 6.0 | FOREIGN CORPORATIONS | 755 |
| 7.0 | SIGNATURE OF BIDDERS | 755 |
| 8.0 | BID BOND AND GUARANTY BOND | 755 |
| 9.0 | WITHDRAWAL OF PROPOSAL | 757 |
| 10.0 | REJECTION OF PROPOSAL BY COUNTY | 757 |
| 11.0 | COMPETENCY OF BIDDERS | 757 |
| 12.0 | AWARD OF CONTRACT | 757 |
| 13.0 | FAILURE TO DELIVER ON TIME | 758 |
| 14.0 | INSURANCE | 758 |
| 15.0 | EQUAL EMPLOYMENT OPPORTUNITY | 758 |
| 16.0 | DELINQUENT TAX AFFIDAVIT | 758 |
| 17.0 | BIDDER'S AFFIDAVIT | 758 |
| 18.0 | NON–COLLUSION AFFIDAVIT | 758 |

II. *BID SPECIFICATIONS*

| | | |
|---|---|---|
| 19.0 | OBJECTIVE | 759 |
| 20.0 | MINIMUM QUALIFICATIONS | 759 |
| 21.0 | MANDATORY REQUIREMENTS | 760 |
| 22.0 | BID EVALUATION | 760 |
| 23.0 | DEVIATIONS AND EXCEPTIONS | 762 |
| 24.0 | REJECTIONS OF PROPOSALS | 762 |
| 25.0 | FAILURE TO PERFORM | 763 |

26.0  TERMINATION NOTICE ................................................763
27.0  SUBCONTRACT .....................................................764
28.0  APPLICABLE LAW...................................................764
29.0  IMMIGRATION REFORM AND CONTROL ACT OF 1986 ...................764
30.0  RELATION TO MAHONING COUNTY ..................................764
31.0  PRESS RELATIONS .................................................765
32.0  CONTRACTOR STAFFING ...........................................765
33.0  COUNTY RESPONSIBILITIES ........................................767
34.0  BILLING..........................................................768

### III.   GENERAL PROVISIONS

35.0  PROVIDER RESPONSIBILITIES.......................................768
36.0  TERMS AND CONDITIONS ..........................................772

### IV.   PROPOSAL NARRATIVE

37.0  IDENTIFICATION AND QUALIFICATIONS OF PROVIDERS ...............774
38.0  STATEMENT OF PROPOSAL AND OBJECTIVES.........................774
39.0  EVALUATION OF PROGRAM EFFECTIVENESS.........................774
40.0  MEDICAL DIRECTOR ...............................................774
41.0  STAFFING .......................................................775
42.0  DENTAL PROGRAM .................................................775
43.0  MENTAL HEALTH PROGRAM .........................................776
44.0  PHARMACY PROGRAM ..............................................776
45.0  LABORATORY SERVICES ...........................................776
46.0  ANCILLARY SERVICES .............................................776
47.0  OPTOMETRY PROGRAM .............................................776
48.0  UTILIZATION REVIEW .............................................776
49.0  QUALITY ASSURANCE PROGRAM .....................................776
50.0  RADIOLOGY SERVICES .............................................776
51.0  INOCULATIONS FOR SHERIFF'S DEPARTMENT EMPLOYEES ...........776

### V.   PROPOSAL

BID PROPOSAL NO. 1 .......................................743
ALTERNATE BID PROPOSAL NO. 2........................................743
ALTERNATE BID PROPOSAL NO. 3........................................744
CONTRACT START–UP ................................................745

VI.   SIGNATURE OF BIDDERS ........................................745

VII.   NON–COLLUSION AFFIDAVIT.....................................745

VIII.  BIDDER'S AFFIDAVIT .........................................746

IX.   DELINQUENT TAX AFFIDAVIT ...................................746

X.   CHECKLIST ....................................................747

I.  *INSTRUCTIONS TO BIDDERS* PLEASE READ THESE INSTRUCTIONS CAREFULLY.  FAILURE TO COMPLY WITH THESE INSTRUCTIONS MAY RESULT IN THE REJECTION OF YOUR BID.

## 1.0  BID IDENTIFICATION

### 1.1  Background

The Mahoning County Justice Center is an eight story facility at 100 Fifth Avenue. This facility is directly across the street from our Minimum Security Misdemeanant Jail (MSMJ). The Justice Center is the central booking facility for all county law enforcement, including the MSMJ. It is a totally non-smoking facility. The facility has a total of 456 cells, of which 564 are general population, single and double cells, of various classifications. In addition to the 564, there are 10 booking and holding cells, which include two violent drunk cells (single occupancy), two multi-occupancy cells, and six standard cells. Fourteen (14) medical cells round out the total.

The 14 medical cells are split into two sections: the female area consisting of four cells, and the male side having ten cells. Of the four female medical cells, two are designed as "acute" care and are oversized to accommodate a hospital bed, one is standard size, and the fourth female cell is pressurized for infections tuberculosis. On the male side, there are also two "acute" care cells, one infections tuberculosis cell, and seven standard cells. Adjacent to the medical housing unit is out medical clinic, which consists of exam rooms, dental treatment, and a complete x-ray facility. The medical clinic will be staffed only on a scheduled basis. Sick call will occur in the various housing units and/or a classroom, which serves two adjacent housing units. A hospital curtain, sink and cabinetry have been included in the classroom design in order to achieve multi-usage of the architectural space and reduce inmate movement.

The Sheriff's Department has a Minimum Security Misdemeanant Jail (MSMJ), which is located at 300 W. Commerce Street. It is a 3rd generation, direct supervision facility that held sentenced, non-violent offenders who were committed for six months or less. It housed a total of 96 inmates, 24 female and 72 male, and was opened October 1994. The average daily population was 60. Inmates were transferred to this facility after booking at the main jail. No smoking was allowed in the facility. However, inmates were permitted periodic smoke breaks in the outside recreation area.

### 1.2  County Health Administrator Background

Mr. Robert Knight, RN is the Health Administrator for the Mahoning County Justice Center and the Mahoning County Minimum Security Misdemeanant Jail. Mr. Knight has been responsible for the day-to-day operations of the Mahoning County Jail Medical Department since 1979.

Mr. Knight will represent the Board of Mahoning County Commissioners and the Mahoning County Sheriff as the contract monitor for the operations and administrative direction of the Health Care Program.

## 2.0 INQUIRIES AND ADDENDA

2.1 Should bidder find any discrepancies in, or omissions from the specifications, or should there be any doubt as to meaning or interpretations, he should at once notify, by facsimile (330) 742–4684, the Mahoning County Purchasing Director, James Fortunato, who will send out written instructions to all bidders. All questions must be submitted seventy two (72) hours preceding the bid opening date, excluding holidays. Mahoning County will not be responsible for any oral instructions.

2.2 The *ADVERTISEMENT FOR BIDS*, which is included in the request for proposal, is hereby made a part of the *INSTRUCTIONS TO BIDDERS*.

## 3.0 DUTIES OF BIDDER

3.1 Bidder shall inspect all Plans, Specifications and site of the work.

3.2 Bidder is to submit one (1) original and three (3) copies of the proposal in its entirety.

3.3 *Bidder Investigations*

Before submitting a bid, each bidder shall make all investigations and examinations necessary to ascertain all conditions and requirements affecting the full performance of the contract and to verify any representations made by the County that the bidder will rely upon. No pleas of ignorance of such conditions and requirements resulting from failure to make such investigations and examinations will relieve the successful bidder from its obligations to comply in every detail with all provisions and requirements of the contract documents or will

be accepted as a basis for any claim whatsoever for any monetary consideration on the part of the successful bidder.

3.4 *Expenses Incurred in Preparing Bid*

The County accepts no responsibility for any expense incurred by the bidder in the preparation and presentation of a bid, and any such expenses are to be born exclusively by the bidder.

## 4.0 PREPARATION OF PROPOSALS

4.1 Proposals must be submitted on the prescribed form, and not detached from the remainder of the contract documents. These documents must be returned intact and without additions or deletions, or else the bid will be termed irregular. Each bidder must furnish, in his proposal, a summary of the information relative to the facilities, abilities and financial resources available for the fulfillment of the contractual obligations. This summary may be provided on separate paper, but should be attached to the contract document package.

4.2 All bids (*original plus three (3) copies*) MUST be submitted in sealed envelopes, bearing on the outside:

Name of the bidder.

Address of the bidder.

Contract for which the bid is submitted.

Date and time of scheduled bid opening.

## 5.0 PERFORMANCE GUARANTEES

5.1 Performance guarantees, as provided in Section 153.54(A)(1) or 153.54(A)(2) of the Ohio Revised Code, accompanying the bid, shall be sealed in the bid envelope, or else the bid will be deemed irregular and may be rejected.

## 6.0 FOREIGN CORPORATIONS

6.1 Bids of Corporations not chartered in the State of Ohio *MUST* be accompanied by proper certifications that such Corporation is authorized to do business in Ohio, or else the bid will be deemed irregular and will be rejected.

## 7.0 SIGNATURE OF BIDDERS

7.1 The firm, corporation or individual name of the bidder must be signed in ink, in the space provided for signatures, on the proposal blanks. In the case of a corporation, the title of the officer signing must be stated, and such officer must be duly authorized to sign the proposal and bind the corporation. Evidence of such authority must be provided by the corporation upon request.

7.2 In the case of a joint venture and/or partnership, the controlling partners must sign, following the firm name. The partner's signature shall be accompanied by the words "members of the firm", "partner", or some other indication of the individual's capacity and authority.

7.3 In the case of an individual, the proprietor must sign, using the words "doing business as" or "sole proprietor".

7.4 In the case of a joint venture/partnership or a sole proprietorship, the bidder shall state the name and address of each individual or corporation interested therein.

## 8.0 BID BOND AND GUARANTY BOND

8.1 EACH PERSON BIDDING FOR THIS CONTRACT SHALL SUBMIT WITH HIS BID, A BID GUARANTY, (attached by paperclip to the front of the bid), IN THE FORM OF *EITHER*:

A. An original bond, in accordance with Division (A)(1) of 153.54 of the Ohio Revised Code, for the full amount of the bid conditioned, as provided in Division (B) of 153.54 of the Ohio Revised Code.

B. A certified check or cashier's check, in accordance with Division (A)(2) of 153.54 of the Ohio Revised Code, equal to five percent (5%) of the bid conditioned, as provided in Division (C) of 153.54 of the Ohio Revised Code.

8.2 *The Bid Guaranty shall be made payable to the Mahoning County Treasurer.*

8.3 *Each Bid Guaranty must be signed* by an authorized agent of an acceptable Surety Bonding Company and by the bidder. The bond must be issued by a Surety Company authorized by the Ohio Department of Insurance to transact business in the State of Ohio. It is essential that the bond be issued by a Surety Company which can adequately demonstrate a record of competent underwriting, efficient management, adequate reserves and soundness of investments.

8.4 Bid Guaranties and Contract Bonds must be supported by credentials showing the Power of Attorney of the Agent to bind the Parent Surety as to the amount.

8.5 Bid Guaranties shall be returned to all unsuccessful bidders immediately after the contract when the lowest bid is executed.

8.6 The amount of the Bid Bond, as provided in 153.54(A)(2) of the Ohio Revised Code, shall be five percent (5%) of the total proposal covering the maximum contract possible.

8.7 If, at any time after the execution of the contract and the required bond, the County shall deem any of the sureties upon such bond to be unsatisfactory, or if, for any reason, such bond shall cease to be adequate security for the County, the contractor shall, within fifteen (15) days after written notice from Mahoning County to do so, furnish new or additional bond. Such bond shall be in the form, amount and signed by such sureties as shall be satisfactory to the County. No further payment shall be deemed due to the contractor, nor shall any such further payment be made to the contractor unless, and until such new or additional bond shall be approved by the County. The premium on such new or additional bonds shall be paid by the contractor.

8.8 *Failure To Enter Into Contract Upon Award*

In the event that the bidder fails to enter the contract upon award, the certified check or bond will be forfeited to Mahoning County as liquidated damages for the delay and expense caused by the bidder's default.

8.9 *Disposition of Proposal Guarantee*

All proposal guarantees submitted with the bids, except those of the lowest two bidders, shall be returned to the person submitting the bid as soon as the lowest two qualified bidders are selected, but in any event within sixty (60) days after receipt of bids.

8.10 In the event the bidder to whom the award is made shall fail to execute and secure the contract within fifteen (15) days of receipt of notice, the County reserves the right to vacate the award. The security of the defaulting bidders shall then be forfeited as liquidated damages. The County may award the contract to the next

lowest qualified bidder who shall thereupon execute and secure the contract within fifteen (15) days of receipt of notice. Should the bidder fail to do so, the bid security shall then be forfeited. The County also reserves the right to reject all the bids and re-advertise for bids upon failure of the apparent low bidder to secure a contract or for any reason.

## 9.0 WITHDRAWAL OF PROPOSAL

9.1 After deposit of the bid with Mahoning County, no bid may be withdrawn by the bidder for a period of sixty (60) days after the opening of the bids.

## 10.0 REJECTION OF PROPOSAL BY COUNTY

10.1 The County may consider informal any bid which is not prepared and submitted in accordance with the provision of these instructions.

10.2 *Mahoning County reserves the right* to reject any or all bids, to waive any informalities in bidding, and to accept any bid deemed most favorable to the County. The County specifically reserves the exclusive right to reject any or all bids and utilize the State Purchasing Program pursuant to Section 125.04(B) of the Ohio Revised Code.

## 11.0 COMPETENCY OF BIDDERS

11.1 The County shall make such investigation as it deems necessary to determine the ability of the bidder to perform the work, or provide goods or services required by the contract. Upon request, the bidder shall furnish evidence satisfactory to the County, that he has the necessary facilities, ability, and financial resources to fulfill the specifications and conditions of the contract.

11.2 The County reserves the right to reject as unresponsive, any bid, if the bidder fails to provide the information requested. The County also reserves the right to reject any bid when the investigation fails to satisfactorily prove that the bidder is qualified to carry out the terms and conditions of the contract.

## 12.0 AWARD OF CONTRACT

12.1 The contract will be awarded to the lowest, best and most responsive bidder.

12.2 No bidder may withdraw his bid for a period of sixty (60) days after the date of opening bids. If not accepted within such period, such bid may be withdrawn without prejudice any time thereafter, except, a bidder for a contract with the County may withdraw his bid from consideration if the price bid was substantially lower than the other bids, providing the bid was submitted in good faith, and the reason for the price bid being substantially low was a clerical mistake, as opposed to a judgement mistake and was actually due to any unintentional and substantial arithmetic error, or an unintentional omission, or an substantial quantity of work, labor or material made directly in the compilation of the bid. Notice of a Claim of Right to Withdraw such bid *must be made in writing and filed with the County within two (2) business days after the conclusion of the bid opening.*

### 13.0 FAILURE TO DELIVER ON TIME

13.1 For each calendar day that lapses after the prescribed time given in the proposal for delivery or performance, the sum of five hundred dollars ($500.00) per day shall be deducted from any money due the contractor, not as a penalty, but as liquidated damages.

### 14.0 INSURANCE

14.1 Upon notification by the Board of Mahoning County Commissioners, the successful bidder will provide proof of adequate general liability and workman's compensation coverage within 15 days of notice of award.

14.2 The bidder must carry professional liability insurance (including subcontractors) in minimum amounts of one million dollars ($1,000,000.00) per occurrence and three million dollars ($3,000,-000.00) in the aggregate annually. The bidder must carry separate general liability insurance (including subcontractors) covering bodily injury, personal injury and property damage in the amount of one million dollars ($1,000,000.00) combined single limit. Malpractice insurance must be carries on all the employees of the provider.

### 15.0 EQUAL EMPLOYMENT OPPORTUNITY

15.1 There shall be no discrimination exercised against any citizen in the employment of labor, whether skilled or unskilled, under this contract. Such discrimination shall be deemed to be a material breach of the contract. Each prospective bidder, during the competitive bidding process, shall subscribe to and comply with the State of Ohio's Equal Employment Opportunity Policy.

15.2 Submission of a current State of Ohio Equal Employment Opportunity Certificate of Compliance, as required by Section 9.47 of the Ohio Revised Code. Mail completed application to: State EEO Office, Certificate Section, 30 E. Broad Street, 18th Floor, Columbus, Ohio 43215.

### 16.0 DELINQUENT TAX AFFIDAVIT

16.1 The bidder must execute and submit a delinquent tax affidavit, as provided, to comply with the requirements of 5719.042 of the Ohio Revised Code, and must accompany the proposal.

### 17.0 BIDDER'S AFFIDAVIT

17.1 Each bidder is required to duly execute the bidder's affidavit stating that all statements and declarations made in the proposal are true to the best of his knowledge and belief, and must accompany the proposal.

### 18.0 NON–COLLUSION AFFIDAVIT

18.1 The bidder will be required to submit a non-collusion affidavit in the form included in the bid package. This affidavit shall be executed and dated before the open-

ing of bids and must accompany the proposal.

## II. BID SPECIFICATIONS

### 19.0 OBJECTIVE

To provide for a constitutionally and professionally adequate standard of medical, mental and dental care, and overall health services to include the following aspects: (1) Administrative Matters; (2) Personnel Matters; (3) Care and Treatment; (4) Pharmacy and Pharmaceuticals; (5) Radiological Services; (6) Mental Health Support Services (the Mahoning County Board of Mental Health—648 Board. Provides Mahoning County two (2) psychiatric counselors weekly at no cost to the county. We encourage the successful contractor to network among all available community mental health resources so as to meet its obligations under contract); (7) Health Records; (8) Achieve a safe, sanitary and humane environment which meets all applicable professional and legal codes and standards, including, but not limited to, the National Commission of Correctional Health Care "Standards for Health Care Services in Jails", and the "Minimum Standards for Jails in Ohio". It shall be the responsibility of the successful bidder to secure necessary certification/accreditation, as offered by those specified agencies, within the first year of operation. This shall be at the cost of the Provider.

### 20.0 MINIMUM QUALIFICATIONS

The agency requires that any bidder meet the following qualifications. Failure to meet each of these qualifications will result in the bidder's disqualification.

20.1 The bidder must be organized and existing for the primary purpose of providing correctional health care services.

20.2 The bidder must have at least five (5) continuous years of corporate experience (not individual experience)

20.3 The bidder must carry professional liability insurance (including subcontractors) in minimum amounts of one million dollars ($1,000,000.00) per occurrence and three million ($3,000,000.00) in the aggregate annually. The bidder must carry separate general liability insurance (including subcontractors) covering bodily injury, personal injury and property damage in the amount of one million dollars ($1,000,000.00) combines single limit. Malpractice insurance must be carried on all the employees of the Provider.

20.4 The bidder must have demonstrated its experience and the quality of its care by having obtained accreditation by the National Commission on Correctional Health Care (NCCHC) in a correctional facility of at least 500 beds.

20.5 The bidder must demonstrate its ability to provide a health care system specifically for the Mahoning County Justice Center and Mahoning County Minimum Security Misdemeanant Jail, hereafter referred to as Centers. It must demonstrate that it has the capability of immediate contract start-up, that it has a proven system of recruiting staff, and that it has an adequate support staff in its central office capable of competently and monitoring its operation.

### 21.0 MANDATORY REQUIREMENTS

All bids must contain the following information:

**21.1** All bidders must contain sufficient information concerning the Program for the agency to evaluate whether or not the bidder meets "Minimum Qualifications." All bids must contain the job description of the individual who will be the onsite Program Administrator.

**21.2** All bids must demonstrate that the bidder has the willingness and ability to comply with the attached Scope of Contract, Specifications and General Conditions, in particular the Standards for Health Services in Jails, 1992 Edition, established by the National Commission on Correctional Health Care.

**21.3** All bids must list the Institution Name, Address, Phone Number, Administrator, List of the Dates of each Contract that has been in effect, and Average Daily Inmate Population of all correctional institutions where bidder is providing medical care.

**21.4** All Proposals must contain a full and complete staffing matrix and organizational chart and must explain how medical care for inmates at the centers will be delivered. At a minimum, sample, "Receiving Screening and Comprehensive Health Assessment" forms shall be provided, as well as an actual "Table of Contents from the Health Care Policies and Procedures Manual" of the bidder.

**21.5** Section left intentionally blank.

**21.6** The bidder is requested to have its proposal completed by in-house personnel and that an oral presentation, if requested, be made using company officers or employees as opposed to retraining consultants and/or representatives for these tasks.

**21.7** The bidder shall be responsible for all medical care for all inmates at the centers. Pursuant to state statutes, this responsibility of the Provider for the medical care of an inmate commences upon intake at the Mahoning County Justice Center.

**21.8** The bidder must address, at a minimum, every point in this bid package. Also, when addressing the requirements and specifications, *the bidder must specifically note which section it is addressing.*

**21.9** The bidder must submit one (1) original and three (3) copies of their proposal.

### 22.0 BID EVALUATION

The purpose of the bid solicitation is:

**22.1** To collect information necessary to the evaluation of competitive proposals submitted by qualified bidders;

**22.2** To obtain a specific annual cost for the proposed comprehensive service, and any proposed terms of any extension thereafter;

**22.3** To provide a fair and objective evaluation of such proposals;

**22.4** To include in proposals (*proposals must include* ) a plan of operation to meet the requirements of the proposed services, i.e.-all of the Provider's operations must comply fully with any requirements of the Ohio Department of Rehabilitation and Corrections, Minimum Standards for Jail in Ohio (Full Service Facility); Standards for Health Services in Jails is-

sued by the National Commission on Correctional Health Care (American Medical Association Standards); all provisions under Ohio Law pertinent to jails, including Ohio Board of Pharmacy.

22.5 To result in a contract between successful bidder and the County of Mahoning, which will meet the following objectives:

A. To deliver high quality health care services at a level equivalent to that which an individual might receive within the community were he/she not incarcerated, and one that can be audited to meet all pertinent legal requirements and professional and other established standards;

B. To operate the health services program at full staffing, as required by standards, utilizing only licensed, certified and professionally trained staff qualified for such duties and tasks assigned. The Provider shall insure that sufficient employees are present to provide those services required in the RFP each day that the agreement is in effect. The County reserves the right to negotiate to the proposed staffing plan after a firm has been selected;

C. To operate such health care services in the most cost-effective manner with full reporting and accountability to the Mahoning County Health Administrator;

D. To produce and implement a written health care plan with clear objectives, policies, procedures and annual evaluations of compliance;

E. To maintain complete and accurate records of care and activity, and to collect and analyze health statistics on a monthly basis;

F. To operate the health services program in a humane manner with respect to the rights of inmates to basic health care services.

22.6 *Previous Correctional Experience*
Provider's previous related experience and performance in correctional medical service. Experience shall include current service in correctional facilities of similar size and volume, as well as experience of staff, district manager and transition team. A resume must be provided for the District Manager and the onsite Program Administrator as part of this proposal.

22.7 *Plan of Operations*
Quality of plan of operations, including changes or improvements, which are deemed advantages by the Sheriff and Board of Commissioners. Plan of operations submitted must demonstrate a clear understanding of the Specifications.

22.8 *Complaint Management*
Procedures for dealing with inmate/staff complaints about medical services minimizing the potential for inmate litigation.

22.9 *Corporate Support*
Quality of support from district or regional office.

22.10 *Current and Former Client Recommendations*

22.11 *Past History, References and Account Terminations*
Vendors shall include a listing of references with their proposals indicating facility locations, average daily inmate population, and name and telephone number of facility contact person. This list should contain at least five (5) current references, preferably of a size comparable to Mahoning County, and reasons for any account terminations during the last three (3) years.

22.12 *Emergency Operations Procedures*

Operational procedures for handling medical service should onsite facility be rendered unusable through fire, riot, etc.

22.13 *Quality and Presentation of Overall Bid Proposal*

22.14 *Cost*

## 23.0 DEVIATIONS AND EXCEPTIONS

23.1 Deviations and exceptions from terms, conditions and specifications shall be described fully, signed and attached to the bid submittal on the Provider's letterhead and must specifically note which section it is addressing. When describing any deviations and/or exceptions, the bidder must specifically note which section it is addressing. In the absence of such statement, the bid submittal shall be accepted as in strict compliance with all terms, conditions and specifications, and the Provider shall be held liable for complying with all specifications.

## 24.0 REJECTIONS OF PROPOSALS

24.1 *County's Rights*

The Sheriff and the Board of County Commissioners of Mahoning County, Ohio, reserve the right to reject any or all bids, to waive any informalities in bids, and to accept the bid, that in the opinion of the Sheriff and the Board, is in the best interests of the County of Mahoning, State of Ohio. Contract award will not necessarily go to the proposal with the lowest price, but to the proposal which best demonstrates the ability to fulfill the requirements of the Contract Specifications contained in the Formal Bid Documents.

24.2 *Delinquent Taxes*

No bid will be accepted from any person, firm or corporation that is in arrears or is in default to Mahoning County, Ohio, upon any debt or contract or has failed to perform faithfully any previous contract with the County. All bidders must complete the attached Delinquent Tax Affidavit pursuant to Ohio Revised Code Section 5719.042, and submit with proposal.

24.3 *Debarment Status*

By submitting a bid, the bidder certifies that it is not currently debarred from submitting bids on contracts by Mahoning County or any political subdivision or agency of the State of Ohio, and is not an agent of any person or entity that is currently debarred from submitting bids on contracts by Mahoning County or any other political subdivision or agency of the State of Ohio.

24.4 *Collusion*

More than one bid from an individual, firm partnership, corporation or association under the same name or different name, will be rejected unless specifically permitted in the Specification. Reasonable grounds for believing that a bidder is interested in more than one bid for the work contemplated may result in rejections of all bids in which a bidder is interested. Any or all bids will be rejected if there is any reason for believing that collusion exists among the bidders. Participants is such collusion may not be considered in future bids for the same work. Each bidder, by submitting a bid, certifies that it is not a party to any collusive action or any action which may be in violation of the Sherman Antitrust Act. Nothing in this section will preclude a firm acting as a subcontractor to be included as a subcontractor for

two or more prime contractors submitting a bid for the work.

### 24.5 *Mandatory Pre–Bid Conference and Site Inspection*

Attendance at a mandatory pre-bid conference will be required of all vendors. All vendors will further be required to inspect both jail facilities during the bidding period. Arrangements to four the facilities should be made by contacting Bob Knight at (330) 480–4961. The Pre–Bid Conference will be held in the Medical Conference Room at the Mahoning County Justice Center, 110 Fifth Avenue, Youngstown, Ohio 44503.

## 25.0 FAILURE TO PERFORM

25.1 The Provider shall commence performing the work in accordance with the specifications. Failure to perform the work as provided herein, may result in written notice to the Provider terminating its right to proceed as to the whole or any part of the contract. In the event of such termination, the County may have the services performed by other means, and the Provider shall be liable to the County for any excess costs for such services.

25.2 Any cost incurred by the County for failure of the Provider to abide by the medical service agreement with the County, or to perform necessary services as described herein, will be borne by the Provider.

## 26.0 TERMINATION NOTICE

### 26.1 *Termination for Cause*

Mahoning County may terminate this contract at any time that the Provider fails to carry out its provisions or to make substantial progress under the term specified in this contract.

26.2 The County shall provide the Provider with thirty (30) days written notice of conditions endangering performance. If after thirty (30) days written notice the Provider has failed to remedy the condition contained in the notice, Mahoning County may issue an order to stop work immediately.

### 26.3 *Termination of Convenience*

This contract may be terminated by either party, provided a ninety (90) day written notice is given to the other party. Written notice to the County must be sent to the Mahoning County Commissioners, and a copy sent to the Mahoning County Sheriff and the Mahoning County Health Administrator.

### 26.4 *Lack of Funds*

Not withstanding any other provisions of the contract, of the funds anticipated for the continued fulfillment of this contract are at any time not forthcoming, through the failure of the County government to appropriate funds, the Mahoning County Board of Commissioners shall have the right to terminate the contract, without penalty, by giving not less than ninety (90) days written notice documenting the lack of funding.

## 27.0 SUBCONTRACT

27.1 The Provider shall not subcontract, assign, transfer, convey or otherwise dispose of any award, or any or all of its rights, title, interest or portion therein of the medical service operation without prior written consent of the County.

## 28.0 APPLICABLE LAW

28.1 This contract shall be governed in all respects by the laws of the State of Ohio, and any litigation with respect thereto shall be brought in the courts in Ohio. The Provider shall comply with applicable federal, state and local laws and regulations.

28.2 State of Ohio–State Budget Bill–HB 66–126th General Assembly JAIL INMATE MEDICAL COSTS–The biennial state budget bill for FY 06/07 enacts a new permanent law section-Section 341.192, Ohio Revised Code-that limits the county's exposure for the costs of medical services provided to jail inmates off site and outside of the jail. If the jail doctor determines that an inmate needs necessary care that can not be provided at the jail and transports the inmate off site to receive that care the hospital, doctor, laboratory, pharmacy or other health care provider that takes care of the inmate may only charge up to an amount which does not exceed the Medicaid provider reimbursement rate established for that service or drug. Necessary care is defined as care of a non-elective nature that cannot be postponed until after the individual's release from jail without endangering the life or health of the individual.

28.2 If the bidder so awarded the Contract is a foreign corporation, the Secretary of State has certified that such corporation is authorized to do business in this state; and until, if the bidder so awarded the Contract is a non-resident person or partnership of this state, such person or partnership has filed, with the Secretary of State, a Power of Attorney designating the Secretary of State as its agent for the purpose of accepting service of summons in any action brought under Section 153.05 of the Revised Code, or under Sections 4123.01 to 4123.94, inclusive of the Revised Code.

## 29.0 IMMIGRATION REFORM AND CONTROL ACT OF 1986

29.1 The Provider certifies that it does not, and will not, during the performance of the Contract, employ illegal alien workers, or otherwise violate the provisions of the Federal Immigration Reform and Control Act of 1986.

## 30.0 RELATION TO MAHONING COUNTY

30.1 The Provider shall be legally considered as an independent provider, and neither the Provider, nor its employees, will, under any circumstances, be considered servants or agents of the County, and the County will be, at no time, legally responsible for any negligence or other wrongdoing by the Contractor, its servants or agents. The County will not withhold, from the contract, payments to the Provider, any Federal or State Income Taxes, Social Security Tax, or any other amounts for benefits to the Provider. Further, the County will not provide to the Provider, any insurance coverage or other benefits, including Worker's Compensation, normally provided by the County for its employees.

## 31.0 PRESS RELATIONS

31.1 All Press releases, advertisements, or any other publication concerning this project, will only be released by authority and approval of the Mahoning County Sheriff.

## 32.0 CONTRACTOR STAFFING

### 32.1 Personnel

Provider shall recruit and interview only candidates who have provided documentation of past health care experience and letters of recommendation. Each candidate shall be interviewed by the Provider, with special focus on technical expertise, emotional stability and motivation. The Mahoning County Health Administrator, or designee, shall be involved in the interviewing process for at least the Medical Director and Director of Nursing and the Health Care Unit Administrator, if a contract position.

32.2 Provider shall engage Ohio licensed/qualified personnel to provide professional coverage for the Centers, according to the schedule of specifications and job descriptions. Provider shall ensure that its staff comply with the terms of the Contract Specifications.

32.3 An onsite visit to the Centers shall be made by all screened candidates prior to employment.

32.4 Initial and continued employment of staff shall be subject to approval of the Mahoning County Sheriff and Health Administrator.

32.5 Personnel files on all contract employees shall be on file with the health care unit of the appropriate Center. These records shall be made available to the Center's Mahoning County Health Administrator or designee. These files shall include, but not be limited to, copies of current Ohio licenses and privileges or proof of professional certification, evaluations and salary/payroll records.

32.6 The Provider shall provide Mahoning County with evidence if all Contract agreements, including but not limited to, hospitals, physicians, dentists, etc., within thirty (30) days of initiation of services to the Mahoning County Health Administrator. Provider shall be responsible for all dealings with its Provider and shall answer all questions posed by them regarding their work.

32.7 The onsite Medical Director at the Centers shall serve as the medical authority and shall interface with Mahoning County or Provider Health Care Unit Administrators in the execution of their duties. The Medical Director shall operate the health care program in accordance with Ohio's Minimum Jail Standards, American Medical Association (AMA), American Correctional Association (ACA), Joint Commission for the Accreditation of Hospital Organizations (JCAHO) Standards, and National Commission of Correctional Health Care (NCCHC).

32.8 Provider shall notify, and consult with, the Mahoning County Health Administrator or designee prior to discharging, removing, or failing to renew the contracts of professional staff and sub-contractual vendors, including, but not limited to, laboratory, EKG, pharmacy, dental laboratory and hospital.

32.9 *Job Descriptions*

Provider shall distribute a written job description approved by Mahoning County Health Administrator to each member of the health care staff which clearly delineates his/her assigned responsibilities. Provider and the Mahoning County Health Administrator shall monitor performance of health care staff to ensure adequate job performance in accordance with these job descriptions and other provisions of this contract.

32.10 *Employee Training and Orientation*

The Provider shall ensure that all contractors' agents and employees who have routine and occasional prisoner contact, comply with the Training Standards as set forth in the most current *Ohio's Minimum Jail Standards* for full-service jails.

32.11 Provider shall provide appropriate in-service education programs. All full-time health care staff, except for dentists and physicians, shall receive 40 hours of in-service training per year.

Selected topics which require staff training shall be identified on an ongoing basis through the Quality Assurance Program.

32.12 Provider shall establish a medical library onsite at the Centers for use by the health care staff. The library shall minimally include a current medical dictionary, Physician's Desk Reference, Pharmacology Reference, JCAJO and ACA Standards Manuals, and other books and periodicals recommended by the Quality Assurance Committee. At the termination of the contract, this library shall become the property of Mahoning County.

32.13 In-service health education training shall be provided for both medical and security staff. The proposal shall outline the contractor's plan to provide in-service training for all medical staff, including methods for diagnosing and treating diseases or illnesses which are recognized to have a particular impact upon inmates.

32.14 All new Corrections staff shall be trained in the availability of medical/mental/dental services, and specifically in: Suicide Prevention (4/hours); Blood-borne Pathogens (8/hours); First-aid (8/hours); Preliminary Health Screening Form (2/hours); Handling of medical problems (2/hours); and Abnormal Behavior (2/hours).

32.15 Medical and mental health staff instructors must apply for and receive certification as a "Special Topic Instructor" in the local Corrections Basic Training Course administered by the Ohio Peace Officer Training Academy.

32.16 Corrections staff shall receive in-service training in CPR, firstaid, and in areas which have been identified as having particular impact on inmates.

32.17 Inmates shall receive patient education as required.

32.18 Provider's employees will be subject to a background investigation and security check, as is normally required for personnel at the County jail. The County reserves the right to deny any Provider's employee access to the facility and/or require the termination of medical service employees who do not meet established clearances or obey established rules and regulations. Final selection of all Provider employees at all Mahoning County jail facilities shall be at the approval of the Sheriff and the County Health Administrator.

## 33.0 COUNTY RESPONSIBILITIES

33.1 Mahoning County Health Administrator's job descriptions function and responsibilities shall be determined solely by the Board of Mahoning County Commissioners.

### 33.2 Equipment and Fixtures

Provide, install, maintain, repair, replace if necessary, and permit the Provider to use all medical service equipment and fixtures. The Centers shall provide and maintain space, equipment, furniture, fixtures (except routine maintenance of X-ray equipment), and other items required for the efficient operation of the health care unit, as agreed upon by the parties, unless expressly excluded by provisions of this agreement. The Ma-honing County Health Administrator shall consult with the Providers for input on the selection and furnishing of the health care facilities and equipment as appropriate. If approved by the Mahoning County Health Administrator of the Centers, the Contractor may purchase medical equipment items or services incidental to this contract, in accordance with Section 307.86 of the Ohio Revised Code and County Purchasing Policies, with the cost to be reimbursed by Mahoning County. Such authorized purchases should be invoiced separately with a specific purchase order. "Equipment" shall be defines as medical equipment with a unit cost in excess of one thousand dollars ($1,000.00). The Provider shall obtain three (3) bids and forward them to the Mahoning County Health Administrator for review. Said equipment shall become property of the Mahoning County at the point of reimbursement to the Provider by Mahoning County.

### 33.3 Utilities

Provide and maintain all utilities except for long distance telephone service; provide trash removal, pest control, office space, including desk, chair, filing cabinet and telephone.

### 33.4 Security

Provide security, control and limitation of inmate movement in, to and from the medical service area consistent with the security provided for Mahoning County Employees.

### 34.0  BILLING

#### 34.1  Contractor Compensation

As full and complete compensation to the Provider for all medical services, labor and materials furnished and all services performed pursuant to these specifications, the County shall pay the Provider monthly payments upon the submission of property certified invoices prepared in a format required by the County.

34.2  Invoices must be itemized. The Contractor and Mahoning County will mutually agree on invoice details within thirty (30) days of notice to proceed.

34.3  Provider shall list, in monthly invoice, the total number of inmates serves by medical and by separate jail facilities.

34.4  Outstanding invoices must be paid within sixty (60) days of the end of contract year.

### III.  GENERAL PROVISIONS

### 35.0  PROVIDER RESPONSIBILITIES

35.1  Provider shall act as an independent contractor insofar as the performance of services hereunder is concerned. In no way shall Provider be considered, or deemed to be engaged, in the practice of medicine. To that end, Provider shall employ, direct and/or contract with such personnel as it requires to perform said services; shall secure any and all permits that may be required in order to perform the services herein contemplated; shall exercise full and complete authority over its employees; shall comply with the Workman's Compensation, Employer's Liability and other Federal, State, County and Municipal Laws, ordinances, rules and regulations required of an employer performing services herein contemplated; and shall make all reports and remit all withholding or other deductions from the compensation paid its personnel, as may be required by any Federal, State, County or Municipal Law, ordinance, rule or regulation.

35.2  Neither Provider, nor any person employed by the Provider to perform services under this agreement, shall be deemed to be an agent or employee of Mahoning County. Further, neither Provider, nor any employees of the Provider, shall be entitled to participate in any retirement or pension plan, group insurance program, or other programs designed to benefit employees of the State of Ohio Department of Corrections.

35.3 Health Care services must be provided in compliance with the standards for Health Care Services in Jails, 2003 edition, established by the National Commission on Correctional Health Care (NCCHC). More specifically, the services provided must meet the NCCHC standards to the extent required to achieve NCCHC accreditation. No language or description contained in the Specifications that follow is intended, nor shall be interpreted in such a way as to relieve the proposer from its obligation to achieve NCCHC accreditation, which is the primary goal of these Specifications.

35.4 The Provider must recruit, interview, hire, train and supervise all health care staff, and such health care staff must be adequate to meet all conditions and specifications of this contract. All medical staff providing services under this contract must be licensed to practice in the State of Ohio. At a minimum, a full-time, onsite Program Administrator shall be provided, who shall have general responsibility for the successful delivery of health care at the jail, pursuant to this contract.

35.5 The Provider shall perform a Comprehensive Health Assessment on any inmate confined at the jail for longer than seventy-two (72) hours within fourteen (14) calendar days of the arrival of the inmate at the jail. Such Assessment shall be performed by a qualified medical professional.

35.6 At a minimum, the Comprehensive Health Assessment shall include:

A. Review of the Receiving Screening results by the Program Administrator or responsible physician.

B. Additional data necessary to complete a standard history and physical.

C. Screening tests for tuberculosis and venereal disease, as well as urinalysis will be performed as clinically indicated.

D. Additional diagnostic procedures, as directed by the physician, for indicated medical or health problems.

E. Height, weight, pulse, blood pressure and temperature.

F. The health of assessment of females will also include inquiry about menstrual cycle and unusual bleeding, the current use of contraceptive medications, the presence of an IUD, breast masses, nipple discharge and possible pregnancy.

35.7 The Provider shall identify the need, schedule, coordinate and pay for all non-emergency and emergency medical care rendered to inmates inside or outside the jail. The Provider shall administer emergency first-response medical care at the jail to any employee or visitor of the jail who requires such care.

35.8 The Provider shall identify the need, schedule, coordinate and pay for any in-patient hospitalization of any inmate of the jail. This shall include all institutional charges, physician charges and any and all other additional charges. This also includes responsibility for making emergency arrangements for ambulance service to the in-patient facility and reimbursement to the ambulance organization for the services provided.

35.9 The Provider shall identify the need, schedule, coordinate and pay for all physician services rendered to inmates inside or outside the jail. At a minimum, the Provider shall identify a "responsible physician" who shall conduct sick call and generally provide such care as is available in the community. The "responsible physician", or another covering physician, shall be on call seven (7) days per week, twenty-four (24) hours per day for emergency situations.

35.10 The Provider shall identify the need, schedule, coordinate and pay for all supporting diagnostic examinations, both inside and outside the jail. The Provider shall also provide and pay for all laboratory services, as indicated.

35.11 The Provider shall provide the necessary follow-up health problems identified by any of the screening tests or laboratory tests. This may include in-patient or out-patient hospitalization, appropriate monitoring and prescription of medications, consultations with specialty physicians, etc.

35.12 The Provider shall identify the need, schedule, coordinate and pay for the services of an optometrist. The Provider shall provide any inmate with one (1) pair of ordinary glasses, if prescribed and deemed necessary by a physician for minimal function by such inmate.

35.13 The Provider shall ensure a total pharmaceutical system for the jail, beginning with a physician prescribing medication, the filling of a prescription, the dispensing of medication and necessary record keeping. The Provider shall be responsible for the costs of all drugs administered. The pharmaceutical system shall include prescription medications and over-the-counter medications. All prescription medications shall be prescribed by the responsible physician or psychiatrist and shall be administered and dispensed by a licensed nurse. All controlled substances, syringes, needles and surgical instruments will be stored under security conditions acceptable to the Sheriff or his designee.

35.14 The Provider shall provide a medical detoxification program for drug and/or alcohol addicted inmates. Such program shall be administered within the facilities of the jail.

35.15 The Provider shall provide and pay for all supplies used in the health care delivery system administered under this contract.

35.16 The Provider shall maintain complete and accurate medical records separate from the jail confinement records of the inmate. In any criminal or civil litigation where the physical or mental condition of an inmate is at issue, or where medical care is at issue, the Provider shall make accessible to the Sheriff or his designee, Health Administrator, and the Mahoning County Prosecutor, such records and, upon request, provide copies.

35.17 The Provider shall provide consultation services to the Administrator of the jail on any and all aspects of the health care delivery system at the jail, including evaluations and recommendations concerning new programs, architectural plans, staffing patterns for new facilities, alternate pharmaceutical and other systems, and on any other matter relating to this contract upon which the jail seeks the advice and counsel of the Provider.

35.18 The Provider must obtain the accreditation of the NCCHC within twelve (12) months of the beginning of the contract term. Failure to obtain such accreditation within this time frame may result in the Provider being considered in breach of contract. Additionally, the bidder must agree to a penalty of fifty thousand dollars ($50,000.00) for failure to achieve or maintain NCCHC accreditation.

35.19 Provider shall make cost containment information available to the Mahoning County Health Administrator.

35.20 Provider shall track all costs related for inpatient hospitalization at the Mahoning County Justice Center and the Minimum Security Misdemeanant Jail (individually) by:

A. Hospital

B. Diagnosis

C. Admitting Physician

D. Admission Date

E. Discharge Date

F. DRG Comparison

35.21 Provider shall track all costs related to outpatient referrals at the Mahoning County Justice Center and the Minimum Security Misdemeanant Jail (individually) by:

A. Patient

B. Facility

C. Diagnosis

D. Treatment

E. Referring Physician

F. Referral Physician

35.22 Provider shall track all costs related to primary health care services at the Mahoning County Justice Center and the Minimum Security Misdemeanant Jail (individually) by:

A. Laboratory Services

B. Radiology Services

C. Other Ancillary Services (i.e. Physical Therapy, Eye Clinics, Oxygen Therapy Tank Rental)

D. Sick Call Services

E. Specialty Services

F. Dental Care

G. Infirmary Care

H. Pharmaceuticals

I. Medical Supplies

35.23 *Safety, Sanitation and Infection Control*

An Infection Control Program shall be implemented by the Provider for the Center in conjunction with public health officials, as requested by the Mahoning County Health Administrator. The Provider shall be responsible for the disposition of medically related infectious and hazardous waste in accordance with State and Federal Regulations.

35.24 Provider shall perform medical examinations, including screening for contagious diseases for all food service employees, or other employees, who prepare or deliver inmate food prior to their assignment in the kitchen. Such examination shall be repeated on a yearly basis. Any inmate trustee working in the kitchen or in connection with the preparation or delivery of food, shall have a physical examination and blood test prior to his assignment in the kitchen.

35.25 Provider shall perform a test for AIDS and hepatitis among the following high risk segments of the population: prostitutes, intravenous drug users, homosexuals, bisexuals, and persons engaging in an active sex life with numerous partners.

35.26 Provider shall submit a monthly report with documentation pertaining to the cost of all offsite care and hospitalization.

36.0 *TERMS AND CONDITIONS*

36.1 The duration of this contract shall be for a two (2) year period with the option to renew for two subsequent one year terms, at the discretion of the Board of Mahoning County Commissioners.

36.2 The health care delivery system must conform to State standards for medical services provided in correctional institutions, as established by any appropriate state authority. The system must conform to the Standards for Health Services in Jails, 2003 edition, established by the National Commission on Correctional Health Care. Generally, health care at the jail should be equivalent to that available in the community.

36.3 The provider shall use the Infirmary at the jail whenever possible and appropriate in the performance of its duties under the contract. The Provider shall be required to examine and treat any inmate in segregation, or otherwise unable to Sick Call, in the cell of said inmate. The Provider shall be required to render emergency care at any location on jail property.

36.4 The Provider shall have no responsibility for security at the jail or for the custody of any inmate at any time, such responsibility being solely that of the agency. The Provider shall have sole responsibility in all matters of medical judgement. The Provider shall have primary, but not exclusive, responsibility for the identification, care and treatment of inmates requiring medical care and who are "security risks" or who present a danger to themselves and others. On these matters of mutual concern, the Administrator of the jail and their staff shall support, assist and cooperate with the Provider, and the Provider shall support, assist and cooperate with the Administrator of the jail whose decision in any non-medical matter shall be final. All decisions involving the exercise of medical judgement are still the responsibility of the Provider.

36.5 The Provider shall indemnify, and hold harmless, the agency and its agents, servants and/or employees from all claims, actions, lawsuits, damages, judgements or liabilities arising out of the health care delivery system at the jail. Conversely, the jail shall indemnify, and hold harmless, the Provider, its agents, servants and/or employees and/or medical and/or health care staff from any and all claims, actions, lawsuits, damages, judgements or liabilities arising out of the operation and maintenance of the jail, including maintaining security.

36.6 The Provider shall have general and professional liability insurance coverage with limits of one million dollars ($1,000,000.00) per occurrence and three million dollars ($3,000,000.00) in the aggregate annually. The insurance shall specifically cover the services provided under this contract and all the employees of the provider. Evidence of such insurance shall be provided to the Mahoning County Health Administrator prior to the execution of the contract. Failure to maintain such insurance shall be grounds for immediate termination of this contract.

36.7 Policies and Procedures of the Provider relating to medical care are to be established and implemented solely by the Provider. In areas which impact upon the security and general administration of the jail, the Policies and Procedures of the Provider are subject to the review and approval of the agency, without limiting the responsibility of the Provider to make its own medical judgments or the discretion of the agency administration to perform its responsibilities under law. Those areas are as follows:

A. Drug, syringe and instrument security;

B. Alcohol and drug medical detoxification.

C. Identification, care and treatment of inmates with special needs, including but not limited to, individuals with hepatitis, epilepsy, physical handicaps, those infected with the Human Immunodeficiency Virus (HIV), and those with any other disease that can be sexually transmitted.

D. Suicide prevention.

E. The use of physical restraints in those situations where inmates are deemed to present a danger to themselves and others.

36.8 The County retains the right to review and approve Policies and Procedures of the Provider in any other area affecting the performance of its responsibilities under law.

36.9 Neither the obligations nor the rights of the Provider under this contract may be assigned by the Provider without the express written consent of the Mahoning County Health Administrator, whose consent shall not be unreasonably withheld.

36.10 The Provider may seek reimbursement for services rendered under this contract from any available third party, including other governmental agencies or programs, Blue Cross and/or Blue Shield, or any other health insurance group. Mahoning County shall cooperate with the Provider in these efforts.

IV. *PROPOSAL NARRATIVE*

Proposal narratives must include and address the following:

37.0 *IDENTIFICATION AND QUALIFICATIONS OF PROVIDER:*

37.1 Outline of organizational capabilities, goals and purposes.

37.2 Evidence of previous accomplishments in health care.

37.3 Identify any other start-up contracts you have been awarded in the last three months, or are due to start within two months of the start of this contract.

38.0 *STATEMENT OF PROPOSAL AND OBJECTIVES:*

38.1 Demonstrate that applicant has a full understanding of the Mahoning County Department of Corrections' mission, objectives, health care system and its problems and needs.

38.2 Review of resources to be utilized to implement proposal. Include a program description.

38.3 Provide a plan and available resources and staff of contractors for providing health care services in the event of emergencies, unavailability of staff, etc.

39.0 *EVALUATION OF PROGRAM EFFECTIVENESS*

39.1 Explain and present relevant material regarding how program effectiveness may be evaluated, both by Mahoning County and by the applicant.

39.2 Include recommended reporting procedure to be utilized.

40.0 *MEDICAL DIRECTOR*

40.1 What will the Medical Director's responsibilities be in regard to:

A. In–Service Training?

B. Quality Assurance?

C. Recruitment?

40.2 What part of onsite time provided by the Medical Director will be committed to:

A. Administrative Duties?

B. Direct Care?

C. Involvement in Quality Assurance?

## 41.0 STAFFING

41.1 Define any requirements your organization has in addition to those specified in the sections contained within the bid package: *I. INSTRUCTIONS TO BIDDERS; II. BID SPECIFICATIONS; III. GENERAL PROVISIONS; IV. PROPOSAL NARRATIVE.*

41.2 A minimum staffing level of: One (1) RN Health Service Administrator; Three (3) Full-time RN's; Seven (7) Full-time LPN's; One (1) full time Med–Records Clerk; Three (3) Part-time RN's; Five (5) Part-time LPN's, plus per diem staff, to cover the Mahoning County Justice Center and the Mahoning County Minimum Security Misdemeanant Jail.

41.3 Clearly state whether a vacation or holiday period is anticipated for given positions, and whether the contractor intends to provide coverage during such a period, or if the position will remain uncovered.

41.4 Identify which positions, names, and, if possible, resumes, including correctional experience of any staff whom you have identified to fill positions.

41.5 Provide statistics on your current staff turn-over for similar contracts.

41.6 Describe your potential for recruitment of local health care providers.

41.7 Provide an itemized salary for each nursing position.

## 42.0 DENTAL PROGRAM

42.1 Explain how the dental program will be conducted, (e.g.: frequencies of various categories of services, compliance with American Dental Association standards regarding the number if dental examinations).

42.2 Identify your prioritization for dental services.

42.3 Explain the circumstances that you would provide periodontal or endodontic specialist care.

## 43.0 MENTAL HEALTH PROGRAM

43.1 Describe your standards in regard to prescribing and monitoring psychotropic drugs, your quality assurance process and standards for psychological services.

## 44.0 PHARMACY PROGRAM

44.1 Describe the unit dose system that you will utilize and policy on substitution of generic drugs.

44.2 Explain if you will operate the pharmacy program onsite, by contract, or other means.

44.3 Describe the controls and accounting process that will be utilized for pharmaceuticals and consumable medical supplies.

## 45.0 LABORATORY SERVICES

45.1 Describe the process to be utilized for needed lab work.

45.2 Describe the Quality Assurance controls utilized to ensure accuracy of reports.

45.3 Describe your policy when the lab report and clinical condition of the patient does not correlate.

## 46.0 ANCILLARY SERVICES

46.1 Describe process for monitoring ambulance services.

46.2 Describe method of obtaining a medical prosthetic; assessment of the rehabilitation potential of the individual; choice of prosthetic in terms of wide range of costs.

## 47.0 OPTOMETRY PROGRAM

47.1 Describe screening program for referrals to the optometrist.

47.2 Describe policy regarding replacement of prosthetics and limits on eye examinations.

## 48.0 UTILIZATION REVIEW

48.1 Describe your monitoring criteria to determine length of stay in outside hospitals; criteria for referring case to infirmary vs. outside hospitals.

## 49.0 QUALITY ASSURANCE PROGRAM

49.1 Who will monitor the activity and "quality" of the Quality Assurance Program?

## 50.0 RADIOLOGY SERVICES

50.1 Describe, in detail, the procedures, policies and routines that will be implemented and carried out to perform radiological services.

## 51.0 INOCULATIONS FOR SHERIFF'S DEPARTMENT EMPLOYEES

51.1 Included in the Sheriff's Labor/Management Collective Bargaining Agreements with the Fraternal Order of Police /Ohio Labor Council, is a provision requiring employee inoculations which states, *"The employer shall provide all inoculations and tests to all bargaining unit employees for Hepatitis, Tuberculosis, and related expenses within sixty (60) days of the signing if this agreement. A new hire will receive all inoculations within ten (10) days of hire"*. Therefore, the County's inmate Medical Service's Provider shall provide all inoculation shots and confirmatory testing for Sheriff's Deputies and civilian employees as routinely required by the Sheriff. Contractor shall also provide inoculations for all other Sheriff's employees and volunteer deputies, as identified by the Sheriff during the term of Contractor's Agreement.

51.2 County agrees to pay Contractor a unit dosage for each inoculation administered to Sheriff's employees. Unit dose prices are to be separately identified by schedule in the Contractor's Bid Proposal. The unit dose price should identify the fixed price and/or mechanism to adjust the unit dose price throughout the term of the contract. (i.e.: Percent increase per year, percent above actual invoice, or fixed price for the term). The unit dose price shall include related costs and labor, and shall reflect the final cost to the County. Unit dose prices for Hepatitis and Tuberculosis shall be separately identified in the Contractor's Price Schedule. Since Hepatitis requires three (3) separate doses, Contractor should price each dose *separately.*

51.3 Contractor agrees to provide annual Tuberculosis testing of all Sheriff's employees. Contractor shall collaborate with the Sheriff to maintain proper custody and control over employee medical records, as well as annual schedules of inoculations.

51.4 County agrees to reimburse Contractor on a quarterly basis for all inoculations administered to Sheriff's employees. The County's Health Administrator (Contract Monitor) shall review and verify all inoculation lists and invoices submitted, and shall be required to authorize all such payments under this article.

51.5 County and Contractor acknowledge that both continually perform operations on a seven (7) day, twenty-four (24) hour basis. As such, inoculations will be performed at mutually agreed upon times and days so that both parties avoid paying staff overtime costs, and will put forth their best efforts to conduct inoculations during member's regularly scheduled work hours. County agrees to provide Contractor with a count and list of employees requiring inoculations in advance, so as to assist Contractor with serum acquisition and other logistics.

RESOLUTION

RES 07–02–029

WHEREAS, the Board of Mahoning County Commissioners and the City of Youngstown desire to enter into an Agreement for the Boarding of City Prisoners in Mahoning County Jail Facilities.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Mahoning County Commissioners, hereby enter into an Agreement for the Boarding of Prisoners between the County of Mahoning and the City of Youngstown effective immediately upon adoption of this Resolution and approval of the City.

BE IT FURTHER RESOLVED, that a copy of said Agreement is on file in the Office of Mahoning County Commission-

ers, 21 W. Boardman Street, Suite 200, Youngstown, Ohio 44503.

It was moved by Mr. McNally, and seconded by Mr. Ludt, that the foregoing Resolution be approved this 7th day of February, 2007.

Roll call voting resulted:
- Mr. Ludt: aye
- Mr. McNally: aye
- Mr. Traficanti: aye

WHEREUPON, the President of the Board declared the foregoing Resolution be duly adopted this 7th day of February, 2007.

/s/ Anthony T. Traficanti
ANTHONY T. TRAFICANTI,
PRESIDENT OF THE BOARD

ATTEST:

/s/ Nancy M. Laboy
NANCY M. LABOY,
CLERK OF THE BOARD

JR. VOL. 95, PAGE 87–88

cc: Prosecutors Office
    County Administrator
    Sheriff
    City of Youngstown

ORD–07–31

### AN ORDINANCE

AUTHORIZING THE BOARD OF CONTROL OF THE CITY OF YOUNGSTOWN TO EXECUTE AN INTERIM STIPULATED POPULATION ORDER AND BOARDING AGREEMENT IN *NATHANIEL ROBERTS, ET AL. VS. MAHONING COUNTY, ETC. ET AL,* IN WHICH THE CITY OF YOUNGSTOWN IS AN INTERVENING PARTY AND THAT SAID INTERIM ORDER INCORPORATES A THREE YEAR BOARDING AGREEMENT WITH MAHONING COUNTY FOR THE BOARDING OF CITY PRISONERS AT THE COUNTY JAIL REQUIRING EXPENDITURE OF FUNDS IN EXCESS OF $25,000.00 PER YEAR IN AN ESTIMATED AMOUNT OF $125,000.00 PER YEAR; AND

FURTHER, AUTHORIZING THE BOARD OF CONTROL TO EXPEND IN EXCESS OF $25,000.00 PER YEAR FOR SAID PURPOSE. FUNDS WILL BE AVAILABLE IN ORG. CODE 071925, POLICE DEPARTMENT, OBJECT CODE 139, OTHER OPERATING SERVICES, AND WILL BE APPROPRIATED THROUGH SEPARATE LEGISLATION ON A YEARLY BASIS; AND

PROVIDING THAT THIS ORDINANCE SHALL BE AN EMERGENCY MEASURE IF IT RECEIVES THE AFFIRMATIVE VOTE OF SIX OF THE MEMBERS OF COUNCIL; OTHERWISE, IT SHALL TAKE EFFECT AND BE IN FORCE FROM AND AFTER THE EARLIEST PERIOD ALLOWED BY LAW.

\* \* \* \* \* \*

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF YOUNGSTOWN, STATE OF OHIO:

### SECTION 1

That the Board of Control of the City of Youngstown be and is hereby authorized to execute an Interim Stipulated Population Order and Boarding Agreement in *Nathaniel Roberts et. al. vs. Mahoning County etc. et al.* in which the City of Youngstown is an intervening party and that said Interim Order incorporates a three year Boarding Agreement with Mahoning County for the boarding of City prisoners at the County Jail requiring expenditure of funds in excess of $25,000.00 per year in an estimated amount of $125,000.00 per year.

### SECTION 2

That the Board of Control is further authorized to expend in excess of $25,000.00 per year for said purpose.

Funds will be available in Org. Code 071925, Police Department, Object Code 139, Other Operating Services, and will be appropriated through separate legislation on a yearly basis.

*SECTION 3*

That this ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of the public peace, welfare and safety, the emergency being the necessity to authorize the Board of Control to execute an Interim Stipulated Population Order and Boarding Agreement and expend in excess of $25,000.00 for said purpose, as above-described; and provided it receives the affirmative vote of six of the members elected to the legislative authority, it shall take effect and be in force immediately upon its passage and approval by the Mayor; otherwise, it shall take effect and be in force from and after the earliest period allowed by law.

PASSED IN COUNCIL THIS 21st DAY OF February 2007.

/s/ _____
PRESIDENT OF COUNCIL

ATTEST:

/s/ Faith C. O'Nesti
CITY CLERK

APPROVED: THIS 23rd DAY OF February, 2007.

/s/ Jay Williams
MAYOR

EXHIBIT C

MAHONING COUNTY SHERIFF'S OFFICE

MAHONING COUNTY SHERIFF'S OFFICE

| SUBJECT: CLASSIFICATION / Inmate Classification | DIRECTIVE # *609.00* GENERAL ORDER # *supercedes all other orders* |
|---|---|
| RELATED DIRECTIVES: Ohio Standards: 5120:1–8–02 | __ NEW **X** AMENDMENT |
| **X** PERMANENT __ TEMPORARY | PURGE DATE |
| ISSUED: 03/23/07   EFFECTIVE: 05/06/07   REVIEW: Annually | |
| AUTHORS: Major James Lewandowski Director Alki Santamas Sgt. Ken Kountz | SHERIFF: Sheriff Randall A. Wellington /s/ Randall A. Wellington |

INDEX AS:
609.1.1 Policy
609.1.2 Scope
609.1.3 General Information
609.1.4 Re–Classification
609.1.5 Minimum Security Jail (MSJ) Classification
609.1.6 Procedure
609.1.7 Review of Classification Status

609.1.1 *POLICY:* Inmates will be classified by set criteria that shall be implemented to the maximum extent, consistent with the design and capacity of the jail in order to preserve security, safety, and order within the jail. This classification system will specify the criteria and procedures for determining the level of custody required, special needs, housing assignment and participation in programming. Inmates will be housed in their properly classified housing area.

**609.1.2** *SCOPE:* This policy will apply to the classification and housing assignment of all inmates by deputies performing jail booking duties and Inmate Systems Management (ISM) staff. If there are any questions or concerns pertaining to classification and/or housing assignment of inmates, staff will consult the shift supervisor.

**609.1.3** *GENERAL INFORMATION:*

A. The criteria to be used in the classification system shall include, but not be limited to the following priorities:

  A.1 Male and female prisoners are housed separately by sight, touch and out of range of normal conversation

  A.2 Juvenile and adult

  A.3 Violent and non-violent prisoners are not placed in the same cell or unsupervised areas together

  A.4 Special needs (e.g., mental and physical handicap)

  A.5 Prior incarceration history

B. During initial intake the booking deputy will complete the classification portion of the booking program. All of the sections of the classification tabs will be completed; inmate information, known history, jail risk, recidivism, evaluation and housing assignment.

C. Gender—the booking deputy will designate the proper sex of the prisoner.

D. *Evaluation Form*—The booking deputy will then complete the Evaluation Form of the Classification section in the booking software program.

  D.1 *Current Charges*—The booking deputy processing the inmate will review all current charges that the inmate is charged with and determine the most serious offense using the appendix provided in this policy.

  D.2 *Prior Charges*—The booking deputy will search the inmate's historical records to determine the most serious past offense using the appendix provided in this policy. If the inmate has no historical data in the booking system, the deputy will run a criminal history check to complete the classification process.

  D.3 *Escape History*—Indicate any prior escape history.

  D.4 *History of Violent Crime Convictions*—List number of violent crime convictions.

E. Once the Evaluation Form section of the classification program is completed, the computer software will recommend a housing unit classification of Maximum, Medium or Minimum Security. The prisoner will be placed in the appropriate housing unit for his or her classification as per section 6.0 of this policy.

F. Prisoners participating in work or educational release programs shall be housed separately from the general population. Such inmates, who classify to the Minimum Security Jail, will be housed at the MSJ as denoted in this Policy. Work and Educational Release prisoners who do not classify to the MSJ will be placed in a segregated housing unit.

G. If the booking deputy determines that no beds are available in the various designated housing units for each classification, the booking deputy will confer with ISM staff to relocate another inmate who is more compatible to house with others of a less severe classification. If re-classification of an inmate is required, ISM staff will follow the Re–Classification Procedure in section 4.0 of this policy. All possibilities will be utilized to ensure that a

prisoner is not housed in a pod that they do not classify to.

G.1 ISM staff will maintain a detailed list of all inmates reclassified and moved as a means to achieve maximum bed space allocation under the conditions described herein.

G.2 The ISM Supervisor and other designated supervisory staff will monitor such lists in order to determine adherence to this policy, proper utilization of bed space, means of reducing the inmate population, and developing rends so as to reduce the need for such population driven reclassifications.

H. After a prisoner has been properly classified and the admissions procedures are complete, staff shall escort the inmate to the appropriate housing unit.

I. If supervisors determine, by prior rule violations or current rule violations, that an inmate exhibits violent behavior towards staff or other inmates and/or is a high risk of escape, deeming it necessary to place additional security restrictions on that inmate, then the supervisor may increase the classification status or classify that inmate as "HIGH RISK". The supervisor will notify the Jail Warden of the "HIGH RISK" status with supporting documents of the incident or incidents and the reason for the restrictions on the appropriate forms.

J. If a prisoner has needs that fall into any of the following categories, the medical staff shall be notified, so it can be determined if special housing is required. If medical staff is not available, the supervisor will make a determination to place the prisoner in special housing or general population.

J.1 Suicide risk

J.2 Mental health problems

J.3 Communicable disease

J.4 Physically handicapped

J.5 Dependency on drugs and/or alcohol

609.1.4 *RE–CLASSIFICATION:*

A. Throughout the inmate's incarceration, ISM staff will review any new or updated information in order to make classification adjustments based on information that might be received after intake, court proceedings, medical examinations, or following disciplinary action for major or serious rule violations.

B. After any needed adjustments have been made in classification, the inmate will be reclassified and placed in the appropriate housing unit.

C. If an inmate is moved from one housing unit to another for reclassification purposes, adjustments will be made in the computer software records under the classification section of the booking system. Under the Housing Assignment tab, staff will be asked to change the classification from Minimum, Medium or Maximum. Staff must provide the reason for the re-classification change in the records.

D. All inmate housing concerns that may affect the need to transfer an inmate from one housing unit to another must be addressed by the Shift Supervisor and reviewed by ISM staff for conformance with this policy. At no time will a housing unit officer reassign an inmate to another housing unit. All housing unit adjustments and/or transfers must also be noted on the prisoner count board and the Cell Transfer tab of the booking program. Such interim transfers will be reviewed according to section 7.0 of this Policy.

### 609.1.5 MINIMUM SECURITY JAIL (MSJ) CLASSIFICATION

A. Inmates classified to the MSJ will be limited to those prisoners sentenced or transferred by order of a judge for a traffic offense, misdemeanor or felony of the fourth or fifth degree that are not offenses of violence, as defined in section 2901.01(A)(9) of the Revised Code.

B. Eligibility for housing at the MSJ will also be based on the inmate's classification designation as determined within this policy. Inmates must be classified as Minimum Security and the classification decision to house a prisoner in the MSJ will include an evaluation to determine whether the prisoner is suitable to be housed in the minimum-security facility.

C. ISM staff will review the inmate's current offense and sentence, prior bookings, past inmate behavior and disciplines to determine placement at the MSJ.

D. Juveniles shall not be held in the Minimum Security Jail.

E. Determination to transfer a prisoner from the MSJ shall be made by the Jail Warden or designee based on the best interests of the prisoner, staff and/or the safe, secure operation of the jail.

### 609.1.6 PROCEDURE:

A. Prisoners will complete the booking process in its entirety and will be given an opportunity to secure release. If the prisoner fails to secure release, they will be classified to the appropriate housing unit as determined by the housing assignment classification recommendation.

B. General Population housing assignment at the Justice Center will be determined by Maximum, Medium and Minimum Security classification. Once all information has been compiled and entered into the jail management software classification program, a composite score will be given and a classification security level will be recommended. Based on this policy, inmates will be housed as follows:

B.1 *Sixth Floor*

| | | |
|---|---|---|
| **R** Pod | Male Medium Security | Available Beds: 52 |
| **U** Pod | Male Medium Security | Available Beds: 52 |
| **S** Pod | Male All Medium or All Minimum Security | Available Beds: 52 |
| **T** Pod | Male All Medium or All Minimum Security | Available Beds: 52 |

B.2 *Fourth Floor*

| | | |
|---|---|---|
| **P** Pod | Male Maximum Security | Available Beds: 36 |
| **Q** Pod | Male Maximum Security | Available Beds: 36 |
| **L** Pod | Male Maximum Security | Available Beds: 36 |
| **N** Pod | Male Minimum/Medium Intake Classification | Available Beds: 18 |
| **O** Pod | Male Disciplinary / High Risk | Available Beds: 18 |

B.3 *Second Floor*

| | | |
|---|---|---|
| **F** Pod | Female Maximum Security | Available Beds: 18 |
| **G** Pod | Female Medium / Minimum Security | Available Beds: 28 |
| **H** Pod | Male Mental Health Special Needs | Available Beds: 48 |
| **I** Pod | Male Segregation | Available Beds: 6 |
| **J** Pod | Male Juvenile Bindovers as Adults | Available Beds: 6 |
| **K** Pod | Male Maximum Security | Available Beds: 30 |
| **D** Pod | Male Minimum Security Inmate Workers | Available Beds: 54* <br> If Male Minimum Security Non–Inmate Workers, then available beds is 48 |
| **E** Pod | Male Administrative Segregation | Available Beds: 6 |

B.4 *First Floor*

B Pod     Female Medical Housing
Available Beds: 4

C Pod     Male Medical Housing     Available Beds: 10

**B.5**  *Minimum Security Jail*

A Pod     All Male or All Female Minimum Security
Available Beds: 24

B Pod     Male Minimum Security
Available Beds: 24
*includes educational and work releases

C Pod     Male Minimum Security
Available Beds: 48

C. The Jail Administration Office will maintain an inmate personal file in those instances where an inmate's incarceration results in the creation of various reports or other documentation such as inmate disciplines, incident reports, separation orders, administrative detention orders, and any other pertinent information.

D. The inmate worker's supervisor and ISM staff shall evaluate and select inmate workers by utilizing the following criteria:

D.1 The nature of the prisoner's offense and sentence. Inmates that will be utilized as inmate workers at the Justice Center will be sentenced and non-sentenced misdemeanants and non-violent felons.

D.2 The prisoner's ability to understand directions.

D.3 The prisoner's day-to-day behavior.

D.4 The prisoner's escape risk.

D.5 The prisoner's health and ability to physically perform the work

E. At no time shall male and female inmates be permitted together in an unsupervised area. Adult male and female prisoners will be housed separately, but may be permitted to attend programming together provided they are supervised by appropriate staff at all times.

F. Juveniles and adult prisoners will be separated in a manner consistent with Section 2151.312 of the Revised Code. These juveniles are those whose criminal case is transferred to the Common Pleas Court for prosecution. Any juvenile so held shall be confined in a manner that keeps the juvenile beyond the range of physical touch of all adult detainees unless those juveniles have been convicted and sentenced as adults.

G. Any classification action which significantly deprives a prisoner of privileges afforded other prisoners, or in any way places him/her in a lesser status, shall be justified in writing (i.e., access to telephone or programming, etc.).

609.1.7 *REVIEW OF CLASSIFICATION STATUS*

A. The ISM night turn staff will review all inmate classifications nightly by running a "Classification By Pod" roster in the Mahoning County Reports in the computer booking software system. The ISM staff will review each inmate's classification and housing assignment to insure that all inmates are housed in accordance with this policy. If the ISM staff finds a discrepancy, such staff are to make the suitable changes in housing unit assignments and update the inmates classification and computer housing unit assignment.

**MOST SERIOUS OFFENSES OF VIOLENCE**

| 2903.01 | Aggravated Murder | Most violent |
|---|---|---|
| 2903.02 | Murder | Most violent |
| 2903.03 | Voluntary Manslaughter | Most violent |
| 2903.04 | Involuntary Manslaughter | Most violent |
| 2903.11 | Felonious Assault | Most violent |
| 2903.12 | Aggravated Assault | Most violent |
| 2905.01 | Kidnapping | Most violent |

| 2907.02 | Rape | Most violent |
| 2909.02 | Aggravated Arson | Most violent |
| 2909.24 | Terrorism | Most violent |
| 2911.01 | Aggravated Robbery | Most violent |
| 2917.01 | Inciting to Violence | Most violent |
| 2917.02 | Aggravated Riot | Most violent |
| 2921.03 | Intimidation | Most violent |

## OFFENSES OF VIOLENCE

| 2903.041 | Reckless Homicide | Violent |
| 2903.13 | Assault | Violent |
| 2903.15 | Permitting Child Abuse | Violent |
| 2903.21 | Aggravated Menacing | Violent |
| 2903.211 | Menacing by Stalking | Violent |
| 2903.22 | Menacing | Violent |
| 2905.02 | Abduction | Violent |
| 2905.11 | Extortion | Violent |
| 2907.03 | Sexual Battery | Violent |
| 2907.05 | Gross Sexual Imposition | Violent |
| 2909.03 | Arson | Violent |
| 2911.02 | Robbery | Violent |
| 2911.11 | Aggravated Burglary | Violent |
| 2911.12 | Burglary | Violent |
| 2917.03 | Riot | Violent |
| 2917.31 | Inducing Panic | Violent |
| 2919.22 | Endangering Children | Violent |
| 2919.25 | Domestic Violence | Violent |
| 2921.04 | Intimidation of Attorney, Victim or Witness in Criminal Case | Violent |
| 2921.34 | Escape | Violent |
| 2923.161 | Improperly Discharging Firearm at or Into Habitation; School-related offenses | Violent |

## ALL OTHER NON–VIOLENT MISDEMEANOR OR FELONY